758 A.2d 1026

**B & P ENTERPRISES**

**v.**

**OVERLAND EQUIPMENT COMPANY.**

No. 1446, Sept. Term, 1999.

Court of Special Appeals of Maryland.

Sept. 5, 2000.

588

Alan W. Margin, Rockville, for Appellant.

Wanda G. Caporaletti, Silver Spring, for Appellee.

Argued before MOYLAN, HOLLANDER and JOHN F. McAULIFFE (Retired, Specially assigned), JJ.

HOLLANDER, Judge.

This case requires us to consider a number of issues arising from a commercial leasehold agreement. Overland Equip-

ment Company ("Overland" or "Tenant"), appellee, operates a motor vehicle towing and storage business on premises leased from B & P Enterprises ("B & P" or "Landlord"), appellant.[1] On appeal, B & P challenges the judgment for damages and order for injunctive relief entered in the Circuit Court for Prince George's County in favor of Overland, the plaintiff below, following a two-day bench trial. B & P presents the following issues for our review, which we have rephrased for clarity:

I. Did the court err in awarding relief to appellee in light of appellee's failure to give appellant written notice of default and an opportunity to cure as required by the lease?

II. Was the evidence sufficient to support the award of damages to appellee with respect to the relocation of vehicles, and, if so, did the court use the appropriate measure of damages?

III. Did the court err in awarding appellee attorney's fees?

IV. Did the court err in granting injunctive relief?

 A. Did the court err by issuing injunctions prior to appellee's satisfaction of the notice provisions set forth in the lease?

 B. Were the terms of injunctive relief supported by the evidence?

 C. Is the injunctive relief awarded of such a character that effective enforcement is unreasonably difficult, requiring long-term judicial supervision?

For the reasons that follow, we shall affirm in part, vacate in part, and remand for further proceedings.

## FACTUAL BACKGROUND

On August 1, 1996, B & P and Overland entered into a five-year written lease agreement (the "Lease") by which appellant

---

**1.** B & P's status as a business entity is somewhat unclear. The record suggests that B & P is either a partnership or a limited corporation. The issue has no bearing on this appeal.

leased the premises located at 11732 to 11736 Annapolis Road in Glenn Dale, Maryland (the "Property") to appellee. The Lease is a printed form containing blanks into which information was typewritten, including the names of the parties and a description of the Property. In addition to the above stated street addresses, the Lease included the following description of the Property:

> The entire second floor of the existing [commercial] building, as well as the "fenced-in" area to the left of the building, along with an additional storage lot to on the rear of the property consisting of approx. 10,000 + -square feet. (Exact location of the additional 10,000 + -square feet to be determined)

The second floor of the office building was used to house Overland's corporate offices. The " 'fenced-in' area to the left of the building," which we will refer to as the "Old Lot," was used to store vehicles. The last paragraph of the preprinted form is numbered "15.27," but a second "15.27" was typed in below it.[2] The typewritten paragraph states:

> Landlord reserves the right to relocate Tenant's "fenced-in" storage lot at some future date, should that become necessary, at Landlord's expense.

At trial, James Mills, Overland's president, described the Old Lot as a large, rectangular property covered with crushed stone, illuminated by three halogen lights, which abuts an asphalt parking lot located in front of the commercial building. According to Mills, the gate to the Old Lot opened onto the parking lot, and Overland's drivers had "easy access" to the asphalt parking lot. He explained: "[Y]ou could come in off of the highway, and pull upon the asphalt and back straight into the [Old Lot]. There was [sic] no grades, no hills, no nothing [sic] was in the way." At the relevant time, the Old Lot had chain link fencing on all sides. Mills also stated that Prince George's County required Overland "to have a privacy fence"

---

2. All references to ¶ 15.27 of the Lease are to the second, typewritten provision.

around the Old Lot. The "privacy fence" consisted of wood slats attached to the chain link fence.

The Lease also referred to the "additional storage lot" (the "Additional Lot"). Mills explained that its location was "to be determined." According to Mills, these terms were included in the Lease to allow for subsequent expansion of Overland's vehicle storage capacity.

Beginning in October 1997, Overland began to use "some space in the rear" of the commercial building for vehicle storage. On October 24, 1997, the County issued a citation to Overland for parking cars on that space without the appropriate permit. Thereafter, Overland began to pursue a use and occupancy permit in order to use the Additional Lot. Mills claimed that Overland's efforts to secure the requisite permit were frustrated by B & P's failure to put stakes in the ground demarcating the Additional Lot.

Between August 1996, when the parties executed the Lease, and May 1998, the State Highway Administration of the Maryland Department of Transportation purchased a portion of the Annapolis Road frontage, which evidently included a portion of the Old Lot. In May 1998, Ted Webersinn, an independent contractor hired by B & P, met with Mills at the Property. According to Mills, Webersinn indicated that he was representing the Landlord and that he was going to be responsible for moving the "fenced-in" area as provided in ¶ 15.27 of the Lease.

In June 1998, however, Mills had a conversation with Harvey Blonder, a B & P representative, which changed his view of the prior discussion with Webersinn. The following trial colloquy is relevant:

> [MILLS:] ... I explained [to Blonder] what Webersinn told me, and how we thought we had something working, and [Blonder] told me that Ted Webersinn was not an employee, had no ability to make any decisions for him, was simply a contractor, and that nothing—that Ted Webersinn had no grounds at all, it was totally irrelevant to not pay attention to it, that he could not speak for Blonder or [B & P].

[APPELLANT'S COUNSEL:] At that point, what did he think about the agreement that you and Mr. Webersinn had worked out?

[MILLS:] I was told it didn't count. It was a wasted effort; that Webersinn had no ability to make any decision.

Nevertheless, in a letter dated September 16, 1998, from Blonder to Mills, Blonder said, in pertinent part:

I have been advised by Ted Webersinn that a contract has been ratified for the moving of your present lot to the designated area in the rear of the building. This entire effort will be coordinated by Ted with your office. He will advise your office when the cars are to be moved from the upper lot by you, at your expense, and he has further advised that your cars will not be protected by a fence for the couple of days it takes to do this job. Therefore, you will have to make other arrangements to protect these cars during this time.

At trial, Mills indicated that he did not know what contract Blonder meant. Moreover, he did not "have any idea what [Blonder] and [Webersinn] are doing at this point." When asked by appellee's counsel what he did upon receipt of Blonder's letter, Mills responded that he did "[a]bsolutely nothing" in light of Blonder's previous contention that Webersinn was not authorized to act on B & P's behalf.

In a subsequent letter to Mills, dated September 25, 1998, Blonder stated:

Please be advised that the removal of the fence around your storage lot will begin on Wednesday, September 30 at 8:30 am, starting at the front portion of the [Old Lot]. As indicated in my previous letter ... you will need to move the cars from the upper lot and you will need to provide protection for your cars during this moving process.

In response to the second letter, Mills contacted Overland's attorney, John Barr,[3] because, in his view, Overland's "County

---

3. Barr represented Overland through the initiation of the present litigation. On May 10, 1999, however, citing irreconcilable differences with

towing [license] requires that the cars be in a restricted confined area, under certain guidelines, in a fenced in lot, lights and so forth." Barr responded to Blonder's letter of September 25, 1998, by a facsimile the same day. Barr's letter of September 25, 1998, stated, in part:

Because it believes that B & P has announced these unilateral actions without honoring its lease obligations, Overland has instructed me to take such steps and actions as are necessary to protect their interests.

Accordingly, be advised the [sic] unless these disputes are settled and resolved, in writing, by the parties hereto, I will on September 28, 1998 ... file a Petition for Ex Parte Injunctive Relief in the appropriate court of the State of Maryland in Prince George's County.

Thereafter, on September 28, 1998, Overland filed suit in the circuit court seeking, *inter alia,* a temporary injunction prohibiting B & P from removing the fencing surrounding the Old Lot, issuance of a show cause order, a declaratory judgment establishing the rights and obligations of the parties to the Lease, and costs. By "Order to Show Cause" dated September 29, 1998, the circuit court denied Overland's request for a temporary injunction, but required B & P to show cause by November 6, 1998.

In the meantime, on October 2, 1998, Blonder sent Mills another letter concerning the proposed move, which stated:

We were not able to start our Project as of September 30, 1998, due to the fact that we could not get the temporary fencing on that date. Therefore, the temporary fencing will be done on Monday, October 5, 1998 beginning at 8:00 a.m., and shortly thereafter we will start pulling down the present fence to relocate it.

Please be further advised that in addition the 10,000 square feet is also available.

---

his client, Barr moved to withdraw his appearance, pursuant to Md. Rule 2–132(b); an order granting that motion was entered on June 9, 1999. Wanda Caporaletti represented Overland at trial.

Mills testified that temporary fencing was installed around an interim lot on the premises, which was to function as the "fenced-in" area pending the move of the permanent fence (the "Interim Lot"). Overland employees subsequently moved the vehicles from the Old Lot to the Interim Lot. By facsimile dated October 21, 1998, from Tom Mehl, comptroller of Overland, to Blonder, Overland advised B & P that B & P was responsible for the costs of that move:

We at Overland ... are anxiously awaiting final approval to relocate our vehicles into their new domicile. However, before proceeding we would greatly appreciate your cooperation [sic] in satisfying the bill for moving the vehicles to the [Interim Lot]. We relocated 95 vehicles at $35 per car for a total due of $3325.00. For your convenience we accept VISA, MC and American Express. Fully detailed invoices for each car are available upon request.

In a facsimile to Mills dated October 22, 1998, Blonder said: "I have been advised that your office has been delivered a copy of the final approval for the new storage area [ (the "New Lot") ]. Therefore, please be advised that the 'temporary' fencing will be taken down on Friday, October 23, 1998 and your cars must be moved into the [New Lot]." Consequently, less than one month after moving vehicles from the Old Lot to the Interim Lot, Overland employees moved more than 100 vehicles from the Interim Lot to the New Lot. Mehl sent a request for payment of the costs associated with the second relocation of vehicles on October 28, 1998, stating:

Pursuant to your instructions in your fax dated October 22, 1998, [Overland] moved 112 vehicles from the [Interim Lot] into the [New Lot]. However, although your fax indicates that the occupancy permit was delivered on that date, we did not, in actuality, receive it until about 10:00 a.m. the following morning at which time the fence contractor was removing the temporary fence exposing the "secured" vehicles and our company to legal liability. Due to the rushed nature of the events we were forced to employ the services of personnel for security measures adding additional expense to the relocation bill.

The "bill" detailed the costs of the second move, totaling $14,045.00, as follows: (1) a supervisor working 73 hours at $50.00 an hour; (2) a yard man working 73 hours at $35.00 an hour; and (3) the "rush" towing of 112 vehicles at $70.00 each. Additionally, Mehl requested that B & P satisfy the earlier "bill" of October 21, 1998, in the amount of $3,325.00. Blonder responded via facsimile the next day, October 29, 1998, stating: "We are in receipt of your bill dated October 21, 1998, as well as another one received on October 28, 1998.... [T]hese bills are not our responsibility, as they were not a part of our agreement with you."

Thereafter, on November 5, 1998, B & P answered the circuit court's show cause order, alleging that "[t]he injunctive relief prayed in the complaint should not be granted as all work is complete and the whole case is moot at this point and such other reasons as will be set forth at the time of the hearing." Also on November 5, 1998, Overland filed a "Line" in the circuit court stating that the purpose for the show cause hearing, scheduled for November 6, 1998, had "been resolved by the parties."

It is not clear why Barr filed the Line. It is apparent, however, that alleged deficiencies in the preparation of the New Lot continued to spark controversy. On November 6, 1998, Mehl sent Blonder a letter complaining that (1) the area allotted within the fencing surrounding the New Lot was deficient; (2) "the gate overlap[ped] by two feet";[4] (3) extra materials were left over from the relocation; (4) the gate was uneven when closed, leaving a one foot gap at the bottom; and (5) certain sections of the fence were only four feet high.

Blonder responded by letter of November 19, 1998, stating: When we completed the fence move, we asked Tom Mehl of your office to inspect the job and report any problems to us particularly because we still had the contractor ready to make any corrections. He said the fence was fine, and his

---

4. The gate to the New Lot consisted of two doors that swung out from hinges attached to the fencing. When closed, the doors were not flush.

only concern at this time was the lights, which we are getting Baltimore Gas and Electric to handle. Because of your acceptance of the fence we paid the Contractor.

 \* \* \*. \* \* \*

... [Y]ou never legally had more than 6,000 [square feet] of car storage area in the first place. Your own permit consultant only got you 6000 [square feet] within the old fenced area that could be used for car storage. In other words, you have never had a use and occupancy permit for use of the entire 14,000+-[square feet] and have been in violation for years.

We obtained for you the full use of the 14,000+-[square foot] fenced area in the rear (plus 16,000 [square feet] of the surrounding area ... ) and the Use & Occupancy permit that makes it legal.

The final written communication of this campaign was sent by Mehl to Blonder on January 20, 1999. In addition to complaining that floodlights had not yet been installed for the New Lot, Mehl raised several matters concerning the access and entrance to the New Lot. He said:

The [Old Lot] was paved outside and graveled inside the gate. When the yard was relocated behind the building, the old bluestone from the [Old Lot] was scraped and moved [to the New Lot] as far as it would spread. Unfortunately, this method was insufficient to cover the entrance and too light to establish good water drainage in many spots throughout many other areas. Additionally, it should be noted that the blueprints show a gravel road access....

As a result of recent rains and ice, the lot is a veritable mud bog. We have been unable to get vehicles in or out and have even had difficulty getting tow trucks through the mush. The yard in this condition is intolerable.

Overland filed its "First Amended Complaint" on February 16, 1999. The four-count complaint sought, *inter alia,* an injunction requiring B & P to provide all-weather access to the New Lot and a compensatory award for its previous failure to do so (Count I); an injunction requiring B & P to make the

fence "sight tight" on all four sides and generally to bring the New Lot into compliance with the Prince George's County Code, and a compensatory award for the expenses associated with moving the vehicles from the Old Lot to the Interim Lot, and then to the New Lot (Count II); an injunction requiring B & P to expand the New Lot to include the same square footage as was provided by the Old Lot (Count III); and an injunction requiring B & P to mark and/or post the undetermined area, a monetary judgment to recover rent paid for the undetermined area that was not provided, and punitive damages (Count IV). B & P answered the first amended complaint on March 1, 1999.

The case proceeded to trial on June 4, 1999. Mills, Mehl, and Charles Holbrook, Overland's night supervisor and a tow truck operator, testified on behalf of Overland. At the conclusion of Overland's case, the court granted B & P's motion for judgment as to Overland's request for punitive damages. On the second day of trial, the defense offered the testimony of Blonder, Webersinn, and Dean Packard, an expert in civil engineering.

The court's judgment is embodied in its order entered July 8, 1999. It provides, in part:

ORDERED, that as to Count One (I) judgment is entered in favor of Plaintiff against the Defendant, and this Court hereby enjoins the Defendant from further interfering with the Plaintiff's reasonable access to the Plaintiff's current lot location, which is the "fenced-in" area as referenced in the Lease Agreement between the parties, and the additional 10,000 square foot lot also referenced in the Lease. That the defendant is further ordered to provide reasonable accessibility to the current fenced-in location and the additional 10,000 square foot lots by improving, upgrading and filling-in the entranceway and roadway to both said lots with gravel or other substance. That this Court finding that said entranceways to said lots contains [sic] slopes, the Defendant is further ordered to eliminate the slopes in the said entranceways and roadways to said lots. That Counsel for the parties shall monitor the above-referenced work, at the

expense of the Defendant. The cost of said work is limited to $2,500.00, unless this court approves an additional, or different, expenditure. That the above-mentioned work shall be done to the approval of the Plaintiff and Defendant and by a contractor that is mutually agreed upon by both the Plaintiff and Defendant. If the parties are unable to agree upon the proper completion of said work or the contractor to perform said work, this Court will consider the appointment of an outside engineer, surveyor or contractor to perform said work and, if necessary, to determine the proper completion of said work, at the expense of either party or both, as determined by this Court as to which party should bear said expense; and it is hereby

ORDERED, that as to Count Two (II) judgment is entered in favor of Plaintiff against Defendant. The Defendant is hereby ordered to repair the gate and/or install a new gate to the current fenced-in lot, at the expense of the Defendant. The Defendant is further ordered to fully and completely enclose all sides of the current fenced-in lot. As there was testimony that one side of the fence is only 4 feet tall, which is lower than the remaining sides, the Defendant is hereby ordered to repair the side of the fence that is 4 feet tall to make it the same height as the other sides of said fence. The Court is not ordering the installation of a new fence. Counsel for the parties shall monitor these gate and fence repairs and/or installations. In addition to the above-mentioned gate and fence repairs, a judgment in the amount of Five Thousand One Hundred and Twenty–Five Dollars ($5,125.00) is hereby entered in favor of the Plaintiff against the Defendant for the Plaintiff's moving of 205 vehicles, on two separate occasions, at the cost of $25.00 per car, to accommodate the Defendant's lot relocation, and it is further

ORDERED, that at [sic] to Count Three (III) judgment is entered in favor of the Defendant against the Plaintiff; and it is hereby;

ORDERED, that as to Count Four (IV) this Court finds in favor of the Plaintiff against the Defendant regarding

paragraph One (1) of the prayer for relief and orders that the Defendant define the exact location, at the expense of the Defendant, of the additional 10,000 square foot lot a referenced in the Lease Agreement by and between the parties by staking out said 10,000 square foot lot by an engineer or surveyor contracted for at the Defendant's expense. That said staking out of this 10,000 square foot lot shall be arranged for and monitored by Counsel for the parties. Thereafter, this Court may order the appointment of an engineer or surveyor to stake out this said 10,000 square foot lot at the expense of either, or both, of the parties, to be determined by this Court; and it [is] further

ORDERED, that as to Count Four (IV) this Court finds in favor of the Defendant against Plaintiff regarding paragraphs Two (2) and Three (3) of the prayer for relief.... [5]

We shall include additional facts in our discussion.

## DISCUSSION

### I.

Maryland Rule 8–131(c) provides the standard by which we ordinarily review cases tried without a jury. It states, in pertinent part:

[T]he appellate court will review the case on both the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses.

---

5. Paragraph 2 concerned rent abatement. The court indicated that it appreciated appellee's argument that it was entitled to back rent in light of appellant's failure to provide the bargained-for additional storage lot. Nevertheless, the court found that the testimony given was "too speculative" to justify an award. That finding is not challenged on appeal.

Paragraph 3 requested punitive damages. As noted, the trial court granted appellant's motion for judgment on that issue at the close of appellee's case.

▆▆▆ The trial court's findings of fact are not clearly erroneous if they are supported by substantial evidence. *See Porter v. Schaffer,* 126 Md.App. 237, 259, 728 A.2d 755, *cert. denied,* 355 Md. 613, 735 A.2d 1107 (1999); *Walker v. State,* 125 Md.App. 48, 54, 723 A.2d 922 (1999); *Sea Watch Stores Ltd. Liab. Co. v. Council of Unit Owners,* 115 Md.App. 5, 31, 691 A.2d 750, *cert. dismissed,* 347 Md. 622, 702 A.2d 260 (1997). In making this determination, we may not substitute our judgment for that of the fact finder, even if we might have reached a different result. *Nicholson Air Servs., Inc. v. Board of County Comm'rs,* 120 Md.App. 47, 67, 706 A.2d 124 (1998). The clearly erroneous standard applies only to findings of fact, however. Thus, we do not defer to the circuit court's legal conclusions. *Oliver v. Hays,* 121 Md.App. 292, 306, 708 A.2d 1140 (1998). Moreover, we will "review the trial court's application of the law to the facts on an abuse of discretion standard." *Porter,* 126 Md.App. at 259, 728 A.2d 755; *see Heat & Power Corp. v. Air Prods. & Chems., Inc.,* 320 Md. 584, 591, 578 A.2d 1202 (1990); *Provident Bank v. DeChiaro Ltd. Partnership,* 98 Md.App. 596, 603, 634 A.2d 973 (1993), *cert. denied,* 334 Md. 210, 638 A.2d 752 (1994).

Because appellee's suit arose out of alleged breaches of the Lease, B & P avers that Overland's failure to follow the notice procedure set forth in the Lease constitutes an absolute bar to appellee's recovery. Appellant refers us to the following Lease provisions:

**ARTICLE 13. DEFAULT**

\*　\*　\*　\*　\*　\*

**13.3. Landlord's Default.** If Landlord fails to perform any covenant, condition, or agreement contained in this Lease within thirty (30) days after receipt of written notice from Tenant specifying such default, or if such default cannot reasonably be cured within thirty (30) days, if Landlord fails to commence to cure within said thirty (30) day period, then Landlord shall be liable to Tenant for any damages sustained by Tenant as a result of Landlord's breach.... If, after notice to Landlord of default, Land-

lord fails to cure such default as provided herein, then Tenant shall have the right to cure such default at Landlord's expense....

\* \* \* \* \* \*

## ARTICLE 15. GENERAL PROVISIONS

\* \* \* \* \* \*

**15.22. Notices.** Wherever in this Lease it is required or permitted that notice or demand be given or served by either party to this Lease to or on the other, such notice or demand shall be in writing and shall be deemed duly served or given only if personally delivered or sent by United States mail, certified or register [sic], postage prepaid, to the address of the parties as specified below....

It is undisputed that Overland never notified B & P of an alleged default under the Lease via certified mail, registered mail, or personal service. Appellant claims that the notice procedures of the Lease constituted a condition precedent to recovery. Appellee counters that because B & P had actual notice of its complaints and was not prejudiced by Overland's failure to give notice in accordance with the Lease, the trial court properly provided the requested relief.[6]

■ Although the issue was raised below, the trial court made no specific findings as to whether the notice provision contained in the Lease was a condition precedent to recovery.

---

6. The parties have referred us to a number of cases they contend are relevant to our resolution of this issue. Appellant provides citations to cases involving insurance policies. *See, e.g., Government Employees Ins. Co. v. Harvey,* 278 Md. 548, 550–55, 366 A.2d 13 (1976) (concluding that although insured notified insurer of automobile accident, the insured's failure to submit requisite documents for proof of claim to insurer within six-month limitation period prescribed by policy constituted a forfeiture of right to recover). Appellee relies on several cases decided in the context of statutorily prescribed notice. *See, e.g., Clark v. Wolman,* 243 Md. 597, 600, 221 A.2d 687 (1966) ("It is well settled that notification *purposed to inform* may be replaced by actual knowledge. And this is especially so when the knowledge has been acted upon without reliance upon the notification's absence or its defects." (citation omitted)). Notwithstanding these citations to "authority," the cases on which the parties rely are not helpful to our resolution of this issue.

It is implicit in the court's decision, however, that the court did not think so. We are satisfied that the provision does not preclude Overland's recovery under the Lease.

We begin our analysis with a review of the law governing the interpretation of contracts. *Cf. Cloverland Farms Dairy, Inc. v. Fry,* 322 Md. 367, 373, 587 A.2d 527 (1991) (applying rules of contract interpretation to lease); *Nicholson Air Servs., Inc. v. Board of County Comm'rs,* 120 Md.App. 47, 63, 706 A.2d 124 (1998) (same). A fundamental principle of contract construction is to ascertain and effectuate the intention of the contracting parties, unless that intention is at odds with an established principle of law. *Hartford Accident & Indem. Co. v. Scarlett Harbor Assocs. Ltd. Partnership,* 109 Md.App. 217, 290–91, 674 A.2d 106 (1996), *aff'd,* 346 Md. 122, 695 A.2d 153 (1997). Thus, "[t]he primary source for determining the intention of the parties is the language of the contract itself." *Scarlett Harbor Assocs.,* 109 Md.App. at 291, 674 A.2d 106. Moreover, "[a] contract must be construed as a whole, and effect given to every clause and phrase, so as not to omit an important part of the agreement." *Baltimore Gas & Elec. Co. v. Commercial Union Ins. Co.,* 113 Md.App. 540, 554, 688 A.2d 496 (1997)

The law of objective interpretation of contracts applies. *See Auction & Estate Representatives, Inc. v. Ashton,* 354 Md. 333, 340, 731 A.2d 441 (1999); *Calomiris v. Woods,* 353 Md. 425, 435, 727 A.2d 358 (1999); *Adloo v. H.T. Brown Real Estate, Inc.,* 344 Md. 254, 266, 686 A.2d 298 (1996). This means that the clear and unambiguous language of a written agreement controls, even if the expression is not congruent with the parties' actual intent at the time of the document's creation. *Ashton,* 354 Md. at 340, 731 A.2d 441; *Calomiris,* 353 Md. at 436, 727 A.2d 358; *Nicholson Air Servs.,* 120 Md.App. at 63, 706 A.2d 124; *Baltimore Gas & Elec. Co.,* 113 Md.App. at 554, 688 A.2d 496; *see General Motors Acceptance Corp. v. Daniels,* 303 Md. 254, 261, 492 A.2d 1306 (1985) ("[T]he true test of what is meant is not what the parties to the contract intended it to mean, but what a

reasonable person in the position of the parties would have thought it meant."). Therefore, " 'the clear and unambiguous language of an agreement will not give way to what the parties thought that the agreement meant or intended it to mean.' " *Calomiris*, 353 Md. at 436, 727 A.2d 358 (citation omitted).

Contractual language is considered ambiguous "if, when read by a reasonably prudent person, it is susceptible of more than one meaning." *Calomiris*, 353 Md. at 436, 727 A.2d 358; *accord Ashton*, 354 at 340, 731 A.2d 441; *Heat & Power Corp.*, 320 Md. at 596, 578 A.2d 1202. In determining whether language is susceptible of more than one meaning, we are not precluded from considering "the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution." *Pacific Indem. Co. v. Interstate Fire & Cas. Co.*, 302 Md. 383, 388, 488 A.2d 486 (1985). If ambiguity is found to exist, then extrinsic evidence may be used to determine the parties' intent. *Sullins v. Allstate Ins. Co.*, 340 Md. 503, 508, 667 A.2d 617 (1995); *Pacific Indem.*, 302 Md. at 389, 488 A.2d 486; *see Kendall v. Nationwide Ins. Co.*, 348 Md. 157, 170, 702 A.2d 767 (1997); *cf. Calomiris*, 353 Md. at 433, 727 A.2d 358 ("All courts generally agree that parol evidence is admissible when the written words are sufficiently ambiguous."). But, it is well-settled that a contract is not ambiguous merely because of a controversy concerning the proper interpretation of its terms. *See Lerner Corp. v. Three Winthrop Properties, Inc.*, 124 Md.App. 679, 685, 723 A.2d 560 (1999).

As the Court of Appeals recently said in *Calomiris*, 353 Md. at 434, 727 A.2d 358, " '[t]he question of whether a contract is ambiguous ordinarily is determined by the court as a question of law.' " (Alteration in original) (quoting *State Highway Admin. v. David A. Bramble, Inc.*, 351 Md. 226, 239, 717 A.2d 943 (1998)); *see Ashton*, 354 Md. at 341, 731 A.2d 441; *JBG/Twinbrook Metro Ltd. Partnership v. Wheeler*, 346 Md. 601, 625, 697 A.2d 898 (1997). The *Calomiris* Court explained, 353 Md. at 434–35, 727 A.2d 358:

[T]he determination of ambiguity ... is subject to *de novo* review by the appellate court.... [T]he review is essentially a "paper" review where the same contractual language is before the appellate court as was before the trial court. Since neither the credibility of witnesses nor the evaluation of evidence, other than the *written* contract, is in issue, the policy reasons behind deferring to the trial judge under the clearly erroneous standard are inapplicable.

In essence, an appellate court reviewing a contract must determine whether the trial court was legally correct. *See id.* If the trial court determined that the contract is ambiguous, and that determination is upheld on appeal, then the clearly erroneous standard is implicated as to the lower court's use of extrinsic evidence with respect to the contract. *See id.*

As indicated, appellant contends that ¶ 13.3 created a condition precedent.

A condition precedent has been defined as "a fact, other than mere lapse of time, which, unless excused, must exist or occur before a duty of immediate performance of a promise arises." ... The question whether a stipulation in a contract constitutes a condition precedent is one of construction dependent on the intent of the parties to be gathered from the words they have employed and, in case of ambiguity, after resort to the other permissible aids to interpretation. Although no particular form of words is necessary in order to create an express condition, such words and phrases as "if" and "provided that," are commonly used to indicate that performance has expressly been made conditional.

*Chirichella v. Erwin,* 270 Md. 178, 182, 310 A.2d 555 (1973) (citations omitted); *accord Hartford Fire Ins. Co. v. Himelfarb,* 355 Md. 671, 680, 736 A.2d 295 (1999); *New York Bronze Powder Co. v. Benjamin Acquisition Corp.,* 351 Md. 8, 14 n. 2, 716 A.2d 230 (1998).

Generally, when a condition precedent is unsatisfied, the corresponding contractual duty of the party whose perfor-

mance was conditioned on it does not arise. *See NSC Contractors, Inc. v. Borders,* 317 Md. 394, 405, 564 A.2d 408 (1989); *Laurel Race Course, Inc. v. Regal Constr. Co.,* 274 Md. 142, 154, 333 A.2d 319 (1975). Given the potentially severe implications of the imposition of a condition precedent, courts have been careful to distinguish a condition precedent from a covenant, which ordinarily requires only substantial compliance. *See Himelfarb,* 355 Md. at 681, 736 A.2d 295.

*Beckenheimer's Inc. v. Alameda Assocs. Ltd. Partnership,* 327 Md. 536, 611 A.2d 105 (1992), is instructive. That case involved an option to renew a sublease. The lessor of the property, a shopping center, sought injunctive relief and a declaratory judgment that the option to renew the sublease had not been properly exercised because of the failure to furnish a certain financial document. The contract provision allowing for the renewal of the sublease read, in part:

> Sublessee shall have the right to renew this Sublease for the additional five (5) year [sic] terms of five (5) years each (the "Renewal Term(s)") provided for in the Lease, *provided as a precondition to the exercise of each Renewal Term,* (1) *Sublessee shall have given Sublessor notice of Sublessee's election to do so at least one hundred twenty (120) days prior to the expiration of the initial ten (10) year term or the then current Renewal Term of the Lease* (2) Sublessee shall not be in default under this Sublease at the time of such notice and (3) *the net worth of Sublessee on the date of such notice (as evidenced by the most recent certified financial statements of Sublessee which shall be included with such notice) is at least equal to the net worth of Sublessee on the date hereof.* All terms and conditions of this Sublease for each Renewal Term shall remain the same as for the initial term except that the annual base rental (not including percentage rental) shall be Sixty-six Thousand and 00/100 Dollars ($66,000).

*Id.* at 540–41, 611 A.2d 105 (alteration in original) (emphasis in original).

The Court determined that the requirements of notice, absence of default, and equivalent net worth were conditions. *Id.* at 553, 611 A.2d 105. It rejected the argument, however, that the language "(as evidenced by the most recent certified financial statements of Sublessee which shall be included with such notice)" was also a condition. *Id.* at 553–54, 611 A.2d 105. Rather, the Court determined that the parenthetical was a covenant. *Id.* at 554, 611 A.2d 105. When notified of the failure to provide the financial statement, the sublessee immediately supplied it. The Court concluded that the sublessee's breach of the covenant by failing to include a financial statement along with its notice of renewal was not a material breach. *Id.* at 555, 611 A.2d 105. Accordingly, the Court stated: "Inasmuch as the three express conditions precedent to [the lessor's] contractual duty to renew have been fulfilled, equity could specifically enforce the covenant to renew." *Id.* at 555–56, 611 A.2d 105.

In arriving at this result, the Court quoted Restatement (Second) of Contracts § 227(2) (1981) (the "Restatement"). Section 227 of the Restatement provides:

(1) In resolving doubts as to whether an event is made a condition of an obligor's duty, and as to the nature of such an event, an interpretation is preferred that will reduce the obligee's risk of forfeiture, unless the event is within the obligee's control or the circumstances indicate that he has assumed the risk.

(2) *Unless the contract is of a type under which only one party generally undertakes duties, when it is doubtful whether*

(a) *a duty is imposed on an obligee that an event occur, or*

(b) *the event is made a condition of the obligor's duty, or*

(c) *the event is made a condition of the obligor's duty and a duty is imposed on the obligee that the event occur, the first interpretation is preferred if the event is within the obligee's control.*

(3) In case of doubt, an interpretation under which an event is a condition of an obligor's duty is preferred over an interpretation under which the non-occurrence of the event is a ground for discharge of that duty after it has become a duty to perform.

(Emphasis added).

The "preference" set forth in Restatement § 227(2) is explained in corresponding commentary:

> *Condition or duty.* When an obligor wants the obligee to do an act, the obligor may make his own duty conditional on the obligee doing it and may also have the obligee promise to do it. Or he may merely make his own duty conditional on the obligee doing it. Or he may merely have the obligee promise to do it.... It may not be clear, however, which he has done. The rule in Subsection (2) states a preference for an interpretation that merely imposes a duty on the obligee to do the act and does not make the doing of the act a condition of the obligor's duty. The preferred interpretation avoids the harsh results that might otherwise result from the non-occurrence of a condition and still gives adequate protection to the obligor under the rules ... relating to performances to be exchanged under an exchange of promises. Under those rules ... the obligee's failure to perform his duty has, if it is material, the effect of the non-occurrence of a condition of the obligor's duty. Unless the agreement makes it clear that the event is required as a condition, it is fairer to apply these more flexible rules. The obligor will, in any case, have a remedy for breach. In many instances the rule in Subsection (1) will also apply and will reinforce the preference stated in Subsection (2)....

Restatement § 227 cmt. d.

In our view, ¶ 13.3 contains an express condition. First, we observe that the terms "if" and "then" are used in ¶ 13.3, evidencing the creation of a condition precedent. *See Chirichella,* 270 Md. at 182, 310 A.2d 555. Second, the plain language of the Lease reflects that the Landlord's liability to Overland for a breach of the Lease is premised on notice from

the Leasee of alleged default, via personal delivery, registered mail, or certified mail, as required by ¶ 15.22. Our discussion does not end here, however.

Restatement § 229 provides:

To the extent that the non-occurrence of a condition would cause disproportionate forfeiture, a court may excuse the non-occurrence of that condition unless its occurrence was a material part of the agreed exchange.

Again, helpful guidance can be found in the commentary:

*Disproportionate forfeiture.* The rule stated in the present Section is, of necessity, a flexible one, and its application is within the sound discretion of the court. Here, as in § 227(1), "forfeiture" is used to refer to the denial of compensation that results when the obligee loses his right to the agreed exchange after he has relied substantially, as by preparation or performance on the expectation of that exchange.... The extent of the forfeiture in any particular case will depend on the extent of that denial of compensation. In determining whether the forfeiture is "disproportionate," a court must weigh the extent of the forfeiture by the obligee against the importance to the obligor of the risk from which he sought to be protected and the degree to which that protection will be lost if the non-occurrence of the condition is excused to the extent required to prevent forfeiture. The character of the agreement may ... affect the rigor with which the requirement is applied.

*Id.* § 229 cmt. b.

The illustration that follows is also illuminating:

A, an ocean carrier, carries B's goods under a contract providing that it is a condition of A's liability for damage to cargo that "written notice of claim for loss or damage must be given within 10 days after removal of goods." B's cargo is damaged during carriage and A knows of this. On removal of the goods, B notes in writing on the delivery record that the cargo is damaged, and five days later informs A over the telephone of a claim for that damage and invites A to participate in an inspection within the ten day

period. A inspects the goods within the period, but B does not give written notice of its claim until 25 days after removal of the goods. *Since the purpose of requiring the condition of written notice is to alert the carrier and enable it to make a prompt investigation, and since this purpose had been served by the written notice of damage and the oral notice of claim, the court may excuse the non-occurrence of the condition to the extent required to allow recovery by B.*

*Id.* cmt. b, illus. 2 (emphasis added).

We are also guided by the decision of the North Dakota Supreme Court in *Red River Commodities, Inc. v. Eidsness,* 459 N.W.2d 805 (N.D.1990). There, a grain dealer initiated suit against a farmer for breach of his contract to deliver sunflowers. Due to a drought, the farmer was unable to deliver the flowers pursuant to the contract, which said, in pertinent part:

Fire, strikes, accidents, acts of God and public enemy, or other causes beyond the control of the parties hereto, shall excuse them from the performance of this contract. Should said events occur, either party is to notify the other within 10 days of the event by Certified Mail. Grower shall be obligated to notify [the dealer] and the contracting representative identified below. Excuse from performance of this contract is dependent upon delivery of this notice.

*Red River,* 459 N.W.2d at 808–09. Although the contract between the parties contained an excuse clause for "acts of God," the dealer's position was that because the farmer failed to provide notice pursuant to the terms of the contract, the farmer was not excused from performance. The farmer acknowledged that he did not provide notice, but argued that the dealer had actual knowledge of the drought and its effect on his sunflower crop, because he orally notified the dealer's agent. The trial court disagreed, and found the farmer in breach. *Id.* at 807.

On appeal to the North Dakota Supreme Court, the farmer argued that, *inter alia,* actual knowledge of the dealer's agent

provided the dealer with notice. The dealer maintained that, regardless of actual knowledge, the farmer failed to send the required notice via certified mail. Interpreting the terms of the agreement, the court stated that the farmer "did not assume the risk of performing if his crop was affected by causes beyond his control, *but he did agree to give [the dealer ] notice of the occurrence of adverse events in a certain way, in writing by certified mail.*" *Id.* at 809 (emphasis added). Nevertheless, the court concluded that the trial court "incorrectly applied the law." The court explained:

> By delivering all of the sunflowers that he did produce, [the farmer] fulfilled his contract to the extent that the supervening contingency of the drought permitted. If, by [the farmer's] notice to its agent, [the dealer] actually and seasonably knew that [the farmer's] sunflower harvest and deliveries would be reduced because of the drought, it is doubtful that [the dealer] was harmed or prejudiced by the lack of a particular form of notice.

*Id.* Further clarifying its conclusion, the court opined: "If the purpose of certified mail notice was fulfilled by [the farmer's] actual notice to the agent and by actual knowledge of [the dealer] (other than through generalized knowledge of drought conditions), the departure from the form of notice was insignificant and trifling." *Id.*

Transmitting written notice by personal delivery, certified mail, or registered mail undoubtedly protects the parties to a contract by insuring that no question arises as to whether a contracting party is, in fact, on notice. Here, however, we are satisfied that appellant had actual, ongoing knowledge of appellee's complaints under the terms of the Lease. In fact, appellant's counsel admitted in closing argument that his client "[s]urely had actual notice in [this] case." The extensive paper trail created by the parties, as recounted above, makes clear that notice effected pursuant to ¶ 15.22 in this case would have been, at best, duplicative. *Cf. Arkla Chem. Corp. v. Palmer,* 250 Ark. 405, 465 S.W.2d 335, 341 (1971); *Red River,* 459 N.W.2d at 809. Nor are we aware of any prejudice to

appellant. We will, therefore, proceed to consider the remaining questions presented by appellant.

## II.

As appellant's second issue concerns ¶ 15.27, we restate it here for convenience:

Landlord reserves the right to relocate Tenant's "fenced-in" storage lot at some future date, should that become necessary, at Landlord's expense.

Appellant avers that, under the unambiguous language of ¶ 15.27, B & P was responsible for moving the "facility," but that did not include the lot's "contents." In other words, B & P concedes that it was financially responsible under the Lease for relocating the elements of the "fenced-in" lot, e.g., fencing, but not the automobiles situated on that lot.

Appellee maintains here that ¶ 15.27 is ambiguous. Therefore, Overland contends that the trial court correctly considered extrinsic testimony from Mills concerning the parties' intentions. The following testimony of Mills is relevant.

[APPELLANT'S COUNSEL:] So, you fully negotiated this lease with B & P?

[MILLS:] Okay.

[APPELLANT'S COUNSEL:] Now, directing your attention to [¶ 15.27] of the lease, on page 12.

 \* \* \* \* \* \*

[APPELLANT'S COUNSEL:] The landlord reserves the right to relocate tenant's fenced in area[.]

[MILLS:] Yes.

[APPELLANT'S COUNSEL:] And, you are aware that was in the lease when you signed it, because you initialed on the left side?

[MILLS:] Yes. It was explained to me at the time that it would be like moving an office. So that it would be at the Landlord's expense to move the office. All of the furniture and everything would be moved, and so that is what we agreed upon.

[APPELLANT'S COUNSEL:] Is that set forth anywhere in the lease?

[MILLS:] It says plainly in the lease, that the Landlord reserves the right to relocate the tenant[']s fenced in storage at some future date, should that become necessary, at the Landlord's expense.

[APPELLANT'S COUNSEL:] Did you ask that it ever be included in the lease as to what exactly they would pay?

[MILLS:] No. I was told it would be like moving an office.

[APPELLANT'S COUNSEL:] You didn't ask?

[MILLS:] You move the office, and you move the contents.

[APPELLANT'S COUNSEL:] Mr. Mills, the question was, did you ask for a provision in the lease specifically stating what would be included in the move?

[MILLS:] I was told that it said at the Landlord's expense, everything would be moved.

[APPELLANT'S COUNSEL:] Did you ask for a specific written statement in the lease as to what would be included?

[MILLS:] No, sir. I did not specify which gravel pieces they would move.

It is unclear from the record who from B & P made the purported representations to Mills about which party would bear the cost of moving the vehicles among the lots. In closing argument, after referring to ¶ 15.27, appellee's counsel said: "Mr. Mills testified that he took [the relocation provision] to understand that included the whole entire lot. The cars, the gravel, the lights, everything in the lot." Further, appellee states in its brief:

Mr. Mills testified at the trial of this case that his intent was that moving the lot would be just like moving an office "you move the office and you move the contents." Moreover, Mr. Mills testified that he was told by the landlord that everything, including the contents, would be moved if relocation became necessary.... [T]his lease provision is susceptible, to a reasonable person, of more than one interpretation.... The lease itself does not define "lot". [*The court*] *was*

*correct in hearing testimony as to what Mr. Mills' intent was at the time he entered into this lease agreement and relying on those facts to reach [its] decision in this case.*

(Emphasis added). We observe, however, that appellee relied on the terms of the Lease in its suit to support its contention that B & P was liable for the costs associated with moving the vehicles.

Appellant did not elicit testimony from its own witnesses with regard to its intent at the time the Lease was executed. Nor did it challenge the testimony elicited from Mills as to the meaning of the Lease. But, in closing argument, appellant's counsel said:

> What we had an obligation to do under the lease was to move, relocate the fenced in storage lot. It was no language in the lease that said and it's [sic] contents. There's no language that lease ever made any mention other than relocating the lots. Now what the parties anticipated is essentially open to conjecture the court would have to do, you know [sic]. No testimony was offered that there was an ambiguity in the lease. What it really meant or I had thought it was [sic]. It's just what the lease says and that's it.

Neither in its oral opinion nor in its July 1999 order did the circuit court make a specific finding as to whether ¶ 15.27 of the Lease is ambiguous so as to justify extrinsic evidence as an interpretive aid. The court acknowledged, however, "that there is a provision of the [L]ease that has been subject to different interpretations dealing with the relocation of the fenced in portion of the storage area." It follows that the court's award of damages to appellee for moving the vehicles resulted from one of two determinations: (1) the court concluded that the Lease was ambiguous with respect to the relocation of the "fenced-in" lot and, consequently, considered extrinsic evidence to ascertain the intent of the parties, or (2) appellant was obligated under the unambiguous terms of the Lease to reimburse appellee.

 The parties agree that it was appellant's responsibility under ¶ 15.27 to move the " 'fenced-in' storage lot" to a new location. The dispute rests on what physical elements were included within the term " 'fenced-in' storage lot." As noted, appellant contends that ¶ 15.27 of the Lease is unambiguous and its duty did not include the movement of the cars on the lots. We agree with appellant that the contract is not ambiguous, but our conclusion in that regard favors appellee. We explain.

 As we observed, contractual terms are to be given their ordinary meaning. *See Ashton*, 354 Md. at 343, 731 A.2d 441; *ST Systems v. Maryland Nat'l Bank*, 112 Md.App. 20, 34, 684 A.2d 32 (1996). Moreover, common sense underlies the principles of contract construction. *See Continental Oil Co. v. Horsey*, 175 Md. 609, 612–13, 3 A.2d 476 (1939); *Philadelphia Indem. Ins. Co. v. Maryland Yacht Club, Inc.*, 129 Md.App. 455, 472–73, 742 A.2d 79 (1999). We may also look to a dictionary to construe the words of a contract. *See Ashton*, 354 Md. at 343, 731 A.2d 441; *Pacific Indem.*, 302 Md. at 388, 488 A.2d 486. *Merriam–Webster's Collegiate Dictionary* (10th ed. 1997) (*"Merriam"*) defines "relocate" to mean "to locate again : establish or lay out in a new place ... : to move to a new location." *Id.* at 988. It provides that something is "fenced" when it is "enclose[d] with[in] a fence." *Id.* at 428. The term "storage" refers to a "space or place for storing." *Id.* at 1159. To "store" is, *inter alia*, "to place or leave in a location (as a warehouse, library, or computer memory) for preservation or later use or disposal." *Id.* A "lot" is "a portion of land b: a measured parcel of land having fixed boundaries and designated on a plot or survey." *Id.* at 689; *see Black's Law Dictionary* 653 (6th abr. ed.1991) (defining a "lot," in the context of real estate, as: "A share; one of several parcels into which property is divided. Any portion, piece, division or parcel of land. Fractional part or subdivision of block, according to plat or survey; portion of platted territory measured and set apart for individual and private use and occupancy.").

In our view, reasonable persons would have construed the contract to mean that relocation of the " 'fenced-in' storage lot' " referred to the lot in its entirety, including the components of the lot—fencing and gate, the gravel, the lighting, and the vehicles stored on the lot. After all, this was a commercial Lease between two business enterprises for property that expressly included a " 'fenced-in' storage lot,' " which the parties knew would be used by appellee for storing vehicles in connection with appellee's business. Paragraph 7.1 of the Lease provided that "Tenant shall use or permit the Premises to be used only for Offices and Auto Towing Station and shall not use or permit the use of the Premises for any other purpose without obtaining the prior written consent of Landlord." Although the Lease permitted the Landlord, if necessary, to move the lot without risking a breach, the Tenant, who rented premises containing a storage lot, was not contractually obligated in that circumstance to bear the expense of moving.

We turn to consider appellant's contention as to damages.

■■■ In its written order, the court awarded appellee a judgment of $5,125.00, representing payment for the movement of 205 vehicles among the Old, Interim, and New Lots at the rate of $25.00 per vehicle. At the end of trial, the court explained its reasoning:

> I have set this figure at $25 per car. There was some testimony that initially the cost was $70 per car, then it was $35 per car. This Court determines $25 is a fair and reasonable figure. Testimony shows that by calculation the first occasion for 95 cars that have to be moved, the second occasion the testimony was 110, 109. I have accepted 110 as the figure. That comes to $5,125.

B & P argues that the evidence was insufficient to support the court's damage award for moving the vehicles. Appellant also complains that the court failed to use the correct measure of damages. Specifically, appellant contends that the evidence was insufficient to support: (1) the $25.00 per vehicle charge; (2) the finding that 95 vehicles were moved from the Old Lot

to the Interim Lot; and (3) the finding that 110 vehicles were moved from the Interim Lot to the New Lot. Appellee responds that there was substantial evidence to support the court's award. We agree with appellee.

As to the purported error in the measure of damages, we note that, in general, the "amount of damages recoverable for breach of contract is that which will place the injured party in the monetary position he would have occupied if the contract had been properly performed," subject to limitations of remoteness and speculativeness. *Hall v. Lovell Regency Homes Ltd. Partnership*, 121 Md.App. 1, 12, 708 A.2d 344, *cert. denied*, 350 Md. 487, 713 A.2d 980 (1998); *see Pennsylvania Threshermen & Farmers' Mut. Cas. Ins. Co. v. Messenger*, 181 Md. 295, 301–02, 29 A.2d 653 (1943); *Dialist Co. v. Pulford*, 42 Md.App. 173, 179, 399 A.2d 1374 (1979). "These expectation interest damages embrace both losses incurred and gains prevented." *Beard v. S/E Joint Venture*, 321 Md. 126, 133, 581 A.2d 1275 (1990), *reconsideration denied*, 322 Md. 225, 587 A.2d 239 (1991).

At trial, appellee relied on testimony from Mehl, and several exhibits, including Plaintiff's Exhibits 14 and 16, to establish damages in connection with the relocation of the vehicles.[7] Plaintiff's Exhibit 14 included the invoices that Overland prepared in connection with the move between the Old Lot and the Interim Lot. According to Mehl, separate invoices of $35.00 for towing were prepared for each vehicle. As to the reasonableness of the charge, the following testimony is relevant:

[APPELLEE'S COUNSEL:] Why did you charge $35.00?

---

7. Plaintiff's Exhibits 14 and 16 are not included in the record. But, the parties agree in their briefs that Exhibit 14 consisted of 95 invoices and Exhibit 16 consisted of 120 invoices. Moreover, both briefs refer to "Exhibit 14" and "Exhibit 16" in the record extract. Notably, the extract contains one page labeled "Exhibit 14" and a second page labeled "Exhibit 16." Each page shows a copy of an Overland "Road Service" invoice with B & P listed as the customer. The year, make, model, license plate, and vehicle identification number of a specific automobile are referenced on each, as is a $35.00 "towing charge."

[MEHL:] It was a standard pricing guide predicated on relocations that we performed, and other companies of our nature performed for this type of service.

[APPELLEE'S COUNSEL:] What do you mean by relocation? Give me an example?

[MEHL:] Parking lots—we'll be hired by an apartment complex or a management complex to relocate vehicles so that they can re-pave a parking lot or something, and this is what we'll charge.

[APPELLEE'S COUNSEL:] And, you're familiar with these various charges as the Comptroller? You see invoices for tow bills day in and day out, is that correct?

[MEHL:] That's correct.

Mehl further testified that the first move involved "around 97. In the ball park of 100 cars." The successive exhibit was the October 21, 1998, facsimile from Mehl to Blonder requesting satisfaction of the bill for towing the vehicles from the Old Lot to the Interim Lot. As recounted above, that document indicated that 95 vehicles were relocated at a cost of $35.00 per vehicle.

Plaintiff's Exhibit 16 consisted of the invoices associated with moving vehicles from the Interim to the New Lot, at a charge of $35.00 each. Nevertheless, a subsequent exhibit, a letter of October 28, 1998, from Mehl to Blonder, requested payment for, *inter alia*, the "rush" towing of 112 vehicles at $70.00 each. In response to an inquiry by appellee's counsel as to the discrepancy between the $35.00 charge on the invoices and the $70.00 charge listed in his letter to Blonder, Mehl stated: "Quite frankly, a lot of this came from frustration, because we were getting very little cooperation or at least we felt so in trying to make this whole project work."

As we said in *Fantasy Valley Resort, Inc. v. Gaylord Fuel Corp.*, 92 Md.App. 267, 607 A.2d 584, *cert. denied*, 328 Md. 237, 614 A.2d 83 (1992), in a case tried without a jury, "[i]f there is any competent material evidence to support the factual findings of the trial court, those findings cannot be held to be clearly erroneous." *Id.* at 275, 607 A.2d 584; *accord Nixon v.*

*State,* 96 Md.App. 485, 491–92, 625 A.2d 404, *cert. denied,* 332 Md. 454, 632 A.2d 151 (1993). With respect to the number of vehicles moved, although there was some uncertainty as to the exact number, we cannot say that the court erred in finding that 95 vehicles were involved in the first move, and 110 in the second. As to the $25.00 per vehicle charge, Mehl's testimony and the accompanying documents showed that $35.00 per vehicle was a "reasonable" charge for towing, and the court awarded less than that sum.

We do not, as appellant suggests, view this case as one where the "record sets forth no basis on which damages could have been assessed." *Yarnick v. King,* 259 Md. 241, 250, 269 A.2d 607 (1970). Appellant's concern that appellee might profit from the relocation of the cars, and that it should only recover the wholesale cost of Overland's towing services, such as the cost of fuel, labor, and equipment depreciation, is without merit.

### III.

Appellant complains that the court erred in awarding attorneys' fees to appellee pursuant to the Lease. The Lease provides:

> **15.10 Attorneys' Fees.** In the event of any action or proceeding brought by either party against the other pertaining to or arising out of this Lease, *the finally prevailing party* shall be entitled to recover all costs and expenses, including reasonable attorneys' fees, incurred on account of such action or proceeding.

(Emphasis added). Appellant asserts that (1) no request for attorneys' fees was made in the first amended complaint; (2) there was no "finally prevailing party," because not all "remedies," including appeals, had been exhausted; and (3) appellee did not satisfy its burden of proof as to attorneys' fees.

 "Maryland follows the American rule which 'stands as a barrier to the recovery, as consequential damages, of foreseeable counsel fees incurred in enforcing remedies for' breach of contract." *Bausch & Lomb Inc. v. Utica Mut. Ins.*

*Co.*, 355 Md. 566, 590, 735 A.2d 1081 (1999) (quoting *Collier v. MD–Individual Practice Ass'n*, 327 Md. 1, 13, 607 A.2d 537 (1992)); *see Reisterstown Plaza Assocs. v. General Nutrition Center, Inc.*, 89 Md.App. 232, 241–42, 597 A.2d 1049 (1991). Attorneys' fees may be awarded, however, if authorized by contract or statute. *Bausch & Lomb*, 355 Md. at 590, 735 A.2d 1081; *Hess Constr. Co. v. Board of Educ.*, 341 Md. 155, 160, 669 A.2d 1352 (1996); *Maxima Corp. v. 6933 Arlington Dev. Ltd. Partnership*, 100 Md.App. 441, 452, 641 A.2d 977 (1994). In the event attorneys' fees are permitted, the award is a factual matter for the trial court that is subject, on appellate review, to a "clearly erroneous" standard. *Holzman v. Fiola Blum, Inc.*, 125 Md.App. 602, 637, 726 A.2d 818 (1999); *Reisterstown Plaza*, 89 Md.App. at 248, 597 A.2d 1049.

Appellant alleges that the award of attorneys' fees was improper because they were not requested in appellee's amended complaint. This point, which is not supported by additional argument, need not detain us long. As we observed, ¶ 15.10 of the Lease expressly provided for an award of attorneys' fees in the event one or the other party was successful in a suit arising out of or pertaining to the Lease. Moreover, each count of appellee's amended complaint contained a provision requesting "such other and further relief as the Court may in the interests of justice deem necessary and proper." Appellee also sought to recover costs.

"Under our liberal rules of pleading, a plaintiff need only state such facts in his or her complaint as are necessary to show an entitlement to relief." *Johns Hopkins Hosp. v. Pepper*, 346 Md. 679, 698, 697 A.2d 1358 (1997); *accord* Md. Rule 2–303(b). Accordingly, a plaintiff must state the issue between the parties with reasonable accuracy so that, *inter alia*, the defendant may be put on notice of the nature of the complaint that he or she is required to answer and defend. *Fletcher v. Havre de Grace Fireworks Co.*, 229 Md. 196, 200, 177 A.2d 908 (1962). Thus, "[w]here certain damages are the natural, necessary, and logical consequence of the acts of the defendant, such damages need not be

specifically requested in the complaint. A general claim for damages will suffice." *Pepper,* 346 Md. at 699, 697 A.2d 1358 (citing *Nicholson v. Blanchette,* 239 Md. 168, 180–81, 210 A.2d 732 (1965); *Weiller v. Weiss,* 124 Md. 461, 466–67, 92 A. 1028 (1915)).

We are equally unpersuaded by appellant's second point. B & P avers in its brief that attorneys' fees are not vested in the "finally prevailing party." Appellant contends that the unambiguous language of ¶ 15.10 "anticipates a finality to the litigation before the right to claim attorneys' fees accrues." In our view, ¶ 15.10 does not contemplate resolution of appellate claims prior to an award of attorneys' fees.

The phrase "prevailing party" is often used in leases when an express term provides for the award of attorneys' fees in connection with an action stemming from the lease's terms. *See, e.g., Raffel v. Medallion Kitchens of Minn., Inc.,* 139 F.3d 1142, 1145 (7th Cir.1998); *Eubanks & Eubanks, Inc. v. Colonial Pac. Leasing,* 757 So.2d 437, 441–42 (Ala.Civ.App.1999); *Georgia Color Farms, Inc. v. K.K.L., Ltd. Partnership,* 234 Ga.App. 849, 507 S.E.2d 817, 820 (1998); *Empire Lumber Co. v. Thermal–Dynamic Towers, Inc.,* 132 Idaho 295, 971 P.2d 1119, 1130–31 (1998); *Beiger Heritage Corp. v. Montandon,* 691 N.E.2d 1334, 1337 (Ind.Ct.App.1998); *Reisterstown Plaza,* 89 Md.App. at 242, 597 A.2d 1049; *Gordon v. Williams,* 986 S.W.2d 470, 474 (Mo.Ct.App.1998); *Norrell v. Aransas County Navigation Dist. # 1,* 1 S.W.3d 296, 303 (Tex.App.1999, writ dism'd); *Wagon Wheel Village, Inc. v. Harris,* 993 P.2d 323, 326 (Wyo.1999). Appellant does not suggest that appellee was not the prevailing party at trial for purposes of ¶ 15.10, but focuses instead on the court's purported neglect of the word "finally." Our research has not revealed a reported opinion from any state or federal court involving a lease, or any other type of contract, in which attorneys' fees was awarded to the "finally" prevailing party.

"Final" is defined as

1 a: not to be altered or undone <all sales are ˜> b: of or relating to a concluding court action or proceeding <˜ de-

cree> **2:** coming at the end : being the last in a series, process, or progress <the ˜chapter> **3:** of or relating to the ultimate purpose or result of a process <our ˜goal>[.]

*Merriam, supra,* at 436. Clearly, the plain language of the Lease contemplates that the prevailing party in an action arising out of the Lease is entitled to attorneys' fees. In our view, use of the adverb "finally" indicates that in court proceedings such as these, a "prevailing party" will be entitled to the costs and expenses to try its case. Our conclusion is bolstered by the concept of a "final judgment."

 A "final judgment" is one that (1) was intended by the trial court as an unqualified and final disposition of the matter in controversy; (2) adjudicates all claims, unless certified pursuant to Md. Rule 2–602(b); and (3) has been properly recorded by the clerk of the court. *Rohrbeck v. Rohrbeck,* 318 Md. 28, 41, 566 A.2d 767 (1989); *Jenkins v. Jenkins,* 112 Md.App. 390, 402, 685 A.2d 817 (1996), *cert. denied,* 344 Md. 718, 690 A.2d 524 (1997). A litigant may generally appeal from a final judgment of the circuit court. Md.Code (1974, 1998 Repl.Vol.), § 12–301 of the Courts & Judicial Proceedings Article. It is undisputed that the court's July 8, 1999, order was a final judgment. Indeed, B & P noted its appeal of that judgment on August 2, 1999.

If a party who prevailed at trial later does not succeed on the merits of the appeal, the appellate court could vacate the award of attorney's fees. This does not mean, however, that the trial court should not have considered the matter of legal fees pursuant to contract. Moreover, if the prevailing party on appeal did not prevail at trial, that party could petition the trial court to recover attorney's fees, just as the party who recovered at trial might seek additional legal fees if successful on appeal. In the end, it is the terms of the contract that governs.

Moreover, appellant could have sought a stay of that part of the judgment awarding money damages, including attorneys' fees, pending resolution of this appeal, pursuant to Md. Rule

8–422.[8] Although B & P did, unsuccessfully, move the circuit court to suspend the injunctive relief portion of the court's judgment, there is no indication in the record that it sought a stay in this Court of the monetary award pending appeal.

■■■■ Appellant's final point focuses on appellee's alleged failure to prove the attorneys' fees. When an award of attorneys' fees is "based on a contractual right, the losing party is 'entitled to have the amount of fees and expenses proven with the certainty and under the standards ordinarily applicable for proof of contractual damages.'" *Maxima*, 100 Md.App. at 453, 641 A.2d 977 (quoting *Bankers & Shippers Ins. Co. v. Electro Enters., Inc.*, 287 Md. 641, 661, 415 A.2d 278 (1980)). If a claim for attorneys' fees is made based on a damages for breach of contract, the claimant must satisfy the standards set forth in *Bankers* and *Maxima*. *Holzman*, 125 Md.App. at 638, 726 A.2d 818; *Commercial Union Ins. Co. v. Porter Hayden Co.*, 116 Md.App. 605, 703, 698 A.2d 1167, *cert. denied*, 348 Md. 205, 703 A.2d 147 (1997).

In *Bankers*, 287 Md. at 661–62, 415 A.2d 278, the Court commented

> that the informal hearing conducted by the trial court neither required any real proof of the amount of the fees and expenses claimed nor provided [the petitioner] with a realistic opportunity to challenge those fees and expenses. . . . Instead, the parties merely submitted, prior to the hearing, informal fee and expense petitions and made short, oral representations at the hearing of the amounts

---

8. Md. Rule 8–422(a) states:

**Generally.** Except as otherwise provided in the Code or Rule 2–632, an appellant may stay the enforcement of a civil judgment, other than for injunctive relief, from which an appeal is taken by filing a supersedeas bond under Rule 8–423, alternative security as prescribed by Rule 1–402(e), or other security as provided in Rule 8–424. The bond or other security may be filed with the clerk of the lower court at any time before satisfaction of the judgment, but enforcement shall be stayed only from the time the security is filed. Stay of an order granting an injunction is governed by Rules 2–632 and 8–425.

claimed. On remand, there should be a proper trial regarding the damages incurred. . . .

In *Maxima,* 100 Md.App. at 453–54, 641 A.2d 977, after quoting the above language from *Bankers,* we went on to discuss the quality and amount of information that a claimant is required to provide. In a segmented compilation, we said:

(a) the party seeking the fees, whether for him/herself or on behalf of a client, always bears the burden of presenting evidence sufficient for a trial court to render a judgment as to their reasonableness; (b) an appropriate fee is always reasonable charges for the services rendered; (c) a fee is not justified by a mere compilation of hours multiplied by fixed hourly rates or bills issued to the client; (d) a request for fees must specify the services performed, by whom they were performed, the time expended thereon, and the hourly rates charged; (e) it is incumbent upon the party seeking recovery to present detailed records that contain the relevant facts and computations undergirding the computation of charges; (f) without such records, the reasonableness, *vel non,* of the fees can be determined only by conjecture or opinion of the attorney seeking the fees and would therefore not be supported by competent evidence.

(Emphasis omitted).

Following the claimant's presentation of evidence in support of an award of attorneys' fees, the trial court must evaluate the reasonableness of the fees. *Holzman,* 125 Md. App. at 639, 726 A.2d 818. The claimant bears the burden "to provide the evidence necessary for the fact finder to evaluate the reasonableness of the fees." *Maxima,* 100 Md.App. at 454, 641 A.2d 977. As recognized in *Reisterstown Plaza,* 89 Md.App. at 246–47, 597 A.2d 1049, the reasonableness of a fee includes consideration of the following factors from Md. Rule of Professional Conduct 1.5(a):

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent.

*See Holzman,* 125 Md.App. at 639–40, 726 A.2d 818; *Maxima,* 100 Md.App. at 454–55, 641 A.2d 977.

Our opinion in *Holzman,* 125 Md.App. 602, 726 A.2d 818, is instructive. There, a real estate broker initiated suit against the Holzmans, husband and wife, to recover a commission allegedly owed pursuant to a listing agreement executed by the parties for the sale of the Holzmans' home. Following a bench trial, the circuit court awarded the broker a money judgment for the commission in the amount of $37,600.00, as well as $12,408.00 in attorneys' fees. Numerous issues were raised on appeal. For reasons unimportant here, we affirmed the court's judgment pertaining to the commission. We disagreed, however, with the court's award of attorneys' fees.

The listing agreement between the broker and the Holzmans provided, *inter alia:* "If Broker prevails in any court action brought to obtain payment of the fee, Broker shall also be entitled to recover in such action his/her reasonable attorney's fees and court costs." *Id.* at 611, 726 A.2d 818. In bringing its suit against the Holzmans, the broker entered into a one-third contingency fee arrangement with the law firm representing the broker. Because the broker prevailed, the focus of the Holzmans' challenge on appeal was not whether the broker was entitled to recover its attorneys' fees from the Holzmans, but whether the Holzmans were obligated to pay

the contingent legal fee of $12,408.00 owed by the broker to its lawyer. We described the issue as "whether the one-third contingency fee arrangement" between the broker and its lawyer was binding upon the Holzmans, stating: "Although the Holzmans agreed to pay [the broker] a reasonable attorney's fee if appellee successfully brought an action to recover its commission, they did not agree to pay whatever legal fee [the broker] might agree to pay its attorney." *Id.* at 637, 726 A.2d 818.

After detailing the tenets underlying an award of attorneys' fees, we set forth the trial court's response to the fee request:

"One-third of $37,600. That clearly is the price that [the broker] is going to have to pay the attorney. Is that amount $12,408 unreasonable? I can't say that it's unreasonable. Can't say." [The Holzmans'] counsel interjected: "No testimony that it is reasonable." The court responded: "No testimony that it isn't unreasonable." *We note, however, that the burden was not on [the Holzmans] to show that a one-third contingency fee was unreasonable. Rather, [the broker] had the burden to demonstrate that the fee was reasonable.*

*Id.* at 641–42, 726 A.2d 818 (emphasis added).

We were of the view that the broker failed to present sufficient evidence to satisfy the factors articulated in *Maxima* or those derived from the Model Rules of Professional Conduct. *Id.* at 640, 726 A.2d 818. Although we acknowledged that the broker's contingent fee arrangement should be considered by the fact-finder, we rejected the position that evidence of that arrangement was sufficient to establish the reasonableness of the fee. *Id.* at 640–42, 726 A.2d 818. In conclusion, we said, at 125 Md.App. at 642, 726 A.2d 818:

Although [the broker] and its attorney contracted for a one-third contingency fee, such an agreement is not *per se* reasonable or binding upon [the Holzmans] for the services rendered. The amount of the fee awarded by the court may well be appropriate. But, based on what was presented to the trial court, we are of the view that the evidence did not

support the award. Accordingly, we shall remand the matter to the circuit court for further proceedings regarding the appropriate legal fee award.

Here, appellee's trial counsel indicated that appellee was seeking attorneys' fees and offered a bill for services of trial counsel and for the services rendered by prior counsel. Because those bills were never admitted in evidence, they are not before us. Nevertheless, it appears from the discussion at trial that the bills simply listed the attorneys' total number of hours. The following colloquy is pertinent:

[APPELLANT'S COUNSEL:] If Your Honor please, I will enter an objection to the attorney fee request.... It's no claim for the attorney fee in the case. The lease doesn't say attorneys['] fees to the prevailing party. If Your Honor please, the only evidence were bills that were represented to by Ms. Caporaletti. Under the case of [*Maxima,* 100 Md.App. 441, 641 A.2d 977,] [a] claim for attorney's fees under a contract ha[s] to be proven with some certainty as a regular damage and [that] was specifically a case where representation[s] were made by counsel. And taking the bill the court said it doesn't satisfy you.

[THE COURT:] Let me ask you the $64 question [sic]. You contest the legal fees accumulated by Mr. Barr and Mrs. Caporaletti?

[APPELLANT'S COUNSEL:] Absolutely. We'd like the opportunity to examine the records, have them testify. It's [sic] been no testimony.

THE COURT: Why don't you take a look at what [appellee's counsel] has accumulated. I'll take a short recess and rule.

MS. CAPORALETTI: Your Honor, I'm sorry, before we do, I have calculated the number of hours for [prior counsel's] bill.

THE COURT: You can put it in the record.

MS. CAPORALETTI: [Prior counsel's] bill is 29.7 hours at $125 an hour. He gave a $200 credit on the bill. It's a $100 cost for the suit, it comes to a total of $3,612.50.

THE COURT: It was $5,312 is what you said earlier.

MS. CAPORALETTI: I'm sorry, I misstated.

[APPELLANT'S COUNSEL:] Your Honor please, I really don't have the necessity of reviewing Ms. Caporaletti's bill. If this is what she said she spent with time, I have no reason to doubt her at all. She made representations to the court.

THE COURT: You look over [prior counsel's] bill then.

Mrs. Caporaletti's bill she just indicated last Friday was $4,680[, i.e., 31.2 hours multiplied by $150 an hour].

MS. CAPORALETTI: Yes, Your Honor.

THE COURT: Okay.

The court then recessed. After approximately a half hour, court resumed and the trial judge immediately delivered his oral opinion. With respect to attorneys' fees, the court opined:

It is undisputed by [appellant's counsel] that Mr. Barr's hours are 29.7 hours at $125 per hour. Mr. Barr according to [appellee's counsel], gave his client a credit that should inure to the benefit of the defendant. So 29.7 hours at $125 per hour less the credit allowed already by Mr. Barr equated to $3,712.50.

[Appellee's counsel] said she charges at the rate of $150. Her hours through last Friday were 31.2 hours. I have allowed for an additional 6 hours. It comes to 37.2 hours. I am in deference to [appellee's counsel] consistent with what Mr. Barr charged. I happen to know Mr. Barr has been practicing law for over twenty years. His rate of pay was $125 per hour. [Appellee's counsel] will be allowed $125 per hour.... The court notes she has not been practicing as long as Mr. Barr. That comes to $3,650.

Accordingly, the July 8, 1999 judgment provides:

ORDERED, that a judgment for attorneys['] fees is hereby entered in favor of the Plaintiff against the Defendant, pursuant to the terms of the Lease Agreement, in the total amount of $8,362.50, which is calculated based upon

29.7 hours performed by John Barr, Esquire at $125.00 per hour, with a credit of $200.00 and court costs of $100.00 and 37.2 hours performed by [appellee's counsel] at $125.00 per hour.

As we see it, the court erred with regard to the award of attorneys' fees. Appellee did not present evidence sufficient to satisfy *appellee's burden* that the fee sought was reasonable. Although appellant's counsel did not dispute the number of hours that appellee's counsel worked, he did not concede that the work was necessary, nor did he waive the production of evidence as to the reasonableness of the fees. Indeed, appellant's counsel expressly invoked *Maxima* and sought to elicit testimonial evidence with respect to the claim. Nevertheless, it appears from the record that the court merely accepted a compilation of hours multiplied by fixed hourly rates, in contravention of the principles espoused in *Maxima.*

We do not question that, with sufficient evidence, appellee could likely prove that its counsels' fees were reasonable. But, we are unable to assess whether the invoices were "detailed records that contain[ed] the relevant facts and computations undergirding the computation of charges," because they are not before us. *Maxima,* 100 Md.App. at 453, 641 A.2d 977. Accordingly, we shall vacate the award of $8,362.50 in attorneys' fees on the ground that there is insufficient evidence in the record to support the award, and remand for further consideration.

### IV.

B & P has raised several challenges to the award of injunctive relief, which it calls "inappropriate." These challenges are either without merit or moot.

An injunction is "an order mandating or prohibiting a specific act." Md. Rule 15–501(a); *see* 12 M.L.E., *Injunctions* § 1, at 250 (1961) (defining an injunction as "a writ framed according to the circumstances of the case commanding an act which the court regards as essential to justice, or restraining an act which it esteems contrary to equity and

good conscience"). It is usually considered "an extraordinary remedy," *Fantasy Valley*, 92 Md.App. at 272, 607 A.2d 584, and the grant or denial of an injunction ordinarily lies within the sound discretion of the trial court. *See Maryland Comm'n on Human Relations v. Downey Communications, Inc.*, 110 Md.App. 493, 521, 678 A.2d 55 (1996); *Fantasy Valley*, 92 Md.App. at 272, 607 A.2d 584; *Scott v. Seek Lane Venture, Inc.*, 91 Md.App. 668, 694, 605 A.2d 942, *cert. denied sub nom. Scott v. Seek Lane & Fernandez*, 327 Md. 626, 612 A.2d 257 (1992). Absent a clear abuse of that discretion, we will not disturb the court's decision. *See Downey Communications*, 110 Md.App. at 521, 678 A.2d 55; *Fantasy Valley*, 92 Md.App. at 272, 607 A.2d 584; *Scott*, 91 Md.App. at 694, 605 A.2d 942.

Although there are three types of injunctions, we find it necessary here to highlight only one, the permanent injunction.[9] A "permanent injunction"[10] issues after a court has rendered a final determination on the merits. *See Ficker v. Denny*, 326 Md. 626, 650, 606 A.2d 1060 (1992); *NCAA v. Johns Hopkins University*, 301 Md. 574, 580, 483 A.2d 1272 (1984). Notwithstanding the usual meaning of the term "permanent," a permanent injunction does not necessarily "last indefinitely." Instead, it " 'is one granted by the judgment which finally disposes of the injunction suit.' " *Downey Communications*, 110 Md.App. at 517, 678 A.2d 55 (quoting 43 C.J.S. *Injunctions* § 6 (1979)).

---

9. Prior to the adoption of current Md. Rules 15–501 through 15–505, the Rules referred to the three types of injunctions issued by the trial court as *ex parte*, interlocutory, and final. Since that time, however, the type of injunctions now available are the temporary restraining order, the preliminary injunction, and the permanent injunction. *See Antwerpen Dodge, Ltd. v. Herb Gordon Auto World, Inc.*, 117 Md.App. 290, 294 n. 1, 699 A.2d 1209, *cert. denied*, 347 Md. 681, 702 A.2d 290 (1997). Nevertheless, prior cases, using earlier terminology, remain pertinent to our determination.

10. A "final injunction" was previously defined as "an injunction final or permanent in its nature granted after a determination of the merits of the action." Md. Rule BB70d (repealed 1997).

With this background in mind, we turn to consider the merits of appellant's contentions.

### A.

In support of its first attack on the injunctive relief awarded in appellee's favor, B & P refers us to *SECI, Inc. v. Chafitz, Inc.*, 63 Md.App. 719, 493 A.2d 1100 (1985). There, we stated that when a party seeking injunctive relief attempts to use an injunction as the "functional equivalent" of a decree for specific performance, the injunction is subject to the same principles that apply to specific performance. *Id.* at 726, 493 A.2d 1100. Additionally, we recognized that "[o]ne of the principles applicable in specific performance cases is that a contract or covenant subject to conditions will not be specifically enforced unless and until the conditions have been either satisfied or waived." *Id.* at 726–27, 493 A.2d 1100. Drawing support from that principle, appellant attempts to reinvigorate the argument it offered earlier, that written notice pursuant to the terms of ¶ 15.22 is a condition precedent to recovery. In light of our resolution of that issue, we decline to address this argument.

### B.

Appellant next contends that the terms of the court's injunction were not supported by the evidence and, therefore, that the court abused its discretion in awarding the injunctive relief. We turn to catalog those specific portions of the court's July 1999 order appellant has chosen to attack.

B & P first points to the requirement in the order that it "provide reasonable accessibility" to the New Lot and the Additional Lot "by improving, upgrading and filling-in the entranceway and roadway to both said lots with gravel or other substance." Additionally, appellant complains about the order's mandate that B & P "eliminate the slopes in the ... entranceways and roadways" to the New and Additional Lots.

Dean Packard, a civil engineer, was the only expert to testify at trial.[11] The following testimony concerning the "entranceways and roadways" was elicited on direct examination:

[APPELLANT'S COUNSEL:] Are you familiar with the access road to the . . . [New Lot]?

[PACKARD:] Yes.

[APPELLANT'S COUNSEL:] Do you have an opinion to a reasonable certainty of the percentage line of the access road as it existed the first time you saw it?

[PACKARD:] Yes. At its deepest point [it] is approximately 12 percent as delineated on the topography provided to me by the county.

[APPELLANT'S COUNSEL:] You base your opinion on the topography?

[PACKARD:] Yes, I do. I have been out to verify that by field check myself.

[APPELLANT'S COUNSEL:] So you personally verified the contours by field check?

[PACKARD:] Yes.

[APPELLANT'S COUNSEL:] Now when was the last time you inspected that road?

[PACKARD:] I was out last Wednesday[, six days ago].

[APPELLANT'S COUNSEL:] And as a result of that inspection were you able to form an opinion to a reasonable certainty as to the present line of the access road?

[PACKARD:] Yes. Based on the walking site and figuring what the original top grade was, it was pre-existing and the elevation of the road at the bottom that was raised, I recalculated the property and what the present slope of the access road. In my professional opinion I believe it to be approximately 8 percent.

---

**11.** Webersinn testified that he is "a certified general commercial and industrial real estate appraiser, landscape architect and a certified planner" and provided his educational and professional background. Nevertheless, appellee never sought to qualify him as an expert.

[APPELLANT'S COUNSEL:] Are there standards or guidelines [for] a civil engineer dealing with the slope of the roads?

[PACKARD:] Yes.

[APPELLANT'S COUNSEL:] And what are those standards?

[PACKARD:] The standards typically for untreated surface here on a ten percent slope and for treated surfaces being gravel slash paving, et cetera, et cetera is fifteen percent is the acceptable limit.

\* \* \* \* \* \*

[APPELLANT'S COUNSEL:] Could you generally describe the condition of the access road when you first inspected it in February 1997?

[PACKARD:] The initial access road at the property was a paved surface. It was broken, covered with gravel. As you went down going beyond the building it turned into more of a gravel surface, and as you went further down in this yard it became more of the dirt covered type surface.

[APPELLANT'S COUNSEL:] Will you describe the condition of the road when you last inspected it last Wednesday?

[PACKARD:] I went out to the site. The surface of the road at the top. It's still the broken asphalt until you get to the rear of the building. From the rear of the building down it is a fill. Dirt has been placed to raise the grounds. There's a gravel packed base and there's about an inch of silt on top of that packed based from the dust from the trucks.[12]

\* \* \* \* \* \*

[APPELLANT'S COUNSEL:] ... [Y]ou heard testimony about a grade break at the bottom of the access road?

[PACKARD:] Yes.

---

**12.** The record suggests that the "dust" resulted from "trucks" involved in a fill dirt construction project adjacent to the Property, but unrelated to Overland's business.

[APPELLANT'S COUNSEL:] Could you describe that grade break, please?

[PACKARD:] ... At the bottom of [the] slope it levels off as you approach the fenced area and you then turn to the right to go to the fenced area. It's at that point there is approximately a two foot drop going from the level graded area to the level where the storage area is. And that two foot drop in about I'd say five to eight feet as it approaches the gate.

[APPELLANT'S COUNSEL:] And you know when that break was first presented?

[PACKARD:] I do not.

[APPELLANT'S COUNSEL:] You know what [the] effect of that grade break is?

[PACKARD:] The effect is to lower the level of the ground from the access road to the storage lot area.

[APPELLANT'S COUNSEL:] And can anything be done to resolve that grade break?

[PACKARD:] I believe some extra fill or gravel could be placed to bring that slope closer to the fence, the storage area to mitigate the grade break.

On cross-examination, Packard opined that it would likely take less than one dump truck load of landfill or gravel to "soften the break" in the access road to the New Lot. The court prompted the following colloquy:

THE COURT: Mr. Packard, you have any idea as to the cost of the fill you are referring to?

[PACKARD:] A dump truck load of dirt ... is between fifty and one hundred dollars.... Gravel is a little bit more, but it is not much. And there is some, you know, an hour or so operation of machinery to spread the gravel and pack it down or dirt.

THE COURT: How long would a fill, based upon your experience, if you can answer that question, how long would a filler, the purpose of eliminating the slope for the time

being? In other words, would someone have to consistently come back and apply additional fill?

[PACKARD:] If it's put down correctly and packed correctly it should last for a matter of months. The more the area is used and operated the faster it will degrade, but I will say for at least three, four months....

Appellant correctly points out that there is no evidence to suggest that the slopes in the access road leading to the New and Additional Lots could be "eliminated," as required by the court. Packard testified only as to the mitigation of the grade. Additionally, appellant maintains that the court did not make any specific finding that B & P failed to provide Overland with "reasonable access" to the New Lot and the Additional Lot. B & P concedes that such a finding would have authorized the court to require that B & P provide reasonable access, but contends that the court "went far beyond a succinct decree of specific performance," alleging:

The court prescribed the manner in which the work was to be done, essentially dictated the persons who were to perform the work (ordering that the work be performed by a contractor mutually agreed upon by the parties stripped [B & P] of the right to choose who performed work upon its property), required that the completed work be approved by the parties, and directed the parties' counsel to arrange for and monitor performance of the work.

The July 1999 order expressly enjoins B & P from interfering with Overland's access to the lots. There was certainly evidence to support the tacit finding that appellant had hindered Overland's access to those lots, as evidenced by Mills's testimony:

[APPELLEE'S COUNSEL:] If I am standing facing [the] front of your building where your office is, would. I have access to [the New Lot] via the left or right?

[MILLS:] The left.

[APPELLEE'S COUNSEL:] So, to go down the left side of the building—

[MILLS:] You go down the hill over the bank.

[APPELLEE'S COUNSEL:] And, I would go down a hill?

[MILLS:] Right.

[APPELLEE'S COUNSEL:] And, describe for the Court the conditions? What is that hill like[?] How is it constructed?

[MILLS:] It's an extremely steep grade. The passenger cars that are not four wheel drive have a difficult time climbing it.

If there is any wet weather or any kind of snow or bad weather conditions, it is totally impassable. . . .

\* \* \* \* \* \*

[APPELLEE'S COUNSEL:] How long is this entrance-way or this driveway to the [New Lot]?

[MILLS:] It is 250 feet.

[APPELLEE'S COUNSEL:] And, is it dirt, is it paved, is it gravel, what is it?

[MILLS:] A cross between gravel and mud.

[APPELLEE'S COUNSEL:] And you said it goes down a hill, is that correct?

\* \* \* \* \* \*

[MILLS:] It's a step downhill, and then there's a plateau, and the another decline right in the fence line of the [New Lot].

And, that if you turn right off of the second grade, it is a steep turn there for—

[APPELLEE'S COUNSEL:] When you go down that second incline that brings you to the gates of the lot?

[MILLS:] Puts you right in the gate of the lot.

[APPELLEE'S COUNSEL:] And, at the bottom, in front of the gate is room for trucks to maneuver around or how do you maneuver trucks around?

[MILLS:] You can't.

[APPELLEE'S COUNSEL:] Why not?

[MILLS:] There is no room whatsoever there.... Half the time ... you have to back down the 250 feet from it, from the original parking lot up top of the hill.

[APPELLEE'S COUNSEL:] When you say back down, what do you mean?

[MILLS:] Okay. You have the car on the back of the wrecker, and you are trying to back it down this steep incline around the turn and through the gates, because there is no room to negotiate, or move at all down in front of the gates.

[APPELLEE'S COUNSEL:] The car that you're towing is going down first, and then the tow truck?

[MILLS:] Yes. You're trying to negotiate that whole thing down through there.

[APPELLEE'S COUNSEL:] Did you have any of these problems before when you [used the Old Lot]?

[MILLS:] No. You pulled on an asphalt parking lot, and backed straight into the [Old Lot]?

Mills also testified that the entrance area to the New Lot was essentially "a marsh area," consisting of mud. In spots, it had up to one foot of standing water.[13]

 In light of the facts of this case, and the obvious discord between the parties, we are satisfied that the circuit court acted within its discretion in ordering B & P to provide reasonable access to the New Lot and the Additional Lot. Moreover, we perceive no abuse in requiring the parties to agree upon the contractor who would repair and upgrade the Property, or in the mandate that the parties approve the work. Although we are troubled by the court's requirement that counsel monitor the progress of the work, that issue, as well as appellant's concerns about its inability to eliminate the slope of the access roads, has been rendered moot by post-trial proceedings in the circuit court. We explain.

---

**13.** Although a number of photographs depicting these conditions were admitted at trial, they are not included in the record.

 "A question is moot 'if, at the time it is before the court, there is no longer an existing controversy between the parties, so that there is no longer any effective remedy which the court can provide.'" *Board of Physician Quality Assurance v. Levitsky,* 353 Md. 188, 200, 725 A.2d 1027 (1999) (quoting *Attorney Gen. v. Anne Arundel County Sch. Bus Contractors Ass'n,* 286 Md. 324, 327, 407 A.2d 749 (1979)); *see Hayman v. St. Martin's Evangelical Church,* 227 Md. 338, 343, 176 A.2d 772 (1962) (stating that "the doctrine of mootness applies to a situation in which past facts and occurrences have produced a situation in which, without any future action, any judgment or decree the court might enter would be without effect"); *Downey Communications,* 110 Md.App. at 512, 678 A.2d 55. Ordinarily, we will not entertain a moot issue, as any opinion on such an issue would be an academic undertaking. *See Wankel v. A & B Contractors, Inc.,* 127 Md.App. 128, 171–72, 732 A.2d 333, *cert. denied,* 356 Md. 496, 740 A.2d 614 (1999); *Beeman v. Department of Health & Mental Hygiene,* 105 Md.App. 147, 157, 658 A.2d 1172 (1995).

On August 2, 1999, the same day appellant noted this appeal, it moved the circuit court to suspend operation of the July 1999 order, pursuant to Md. Rule 2–632(f).[14] As part of its motion, B & P alleged that it had "performed a substantial amount of the work ordered by the Court," indicating that it had:

a) improved, upgraded, and filled in the entranceway and roadway to both the "fenced in area" and the "additional 10,000 square foot lot."

b) significantly reduced the slope in the entranceways and roadways to each of the two lots identified in the Order; and

---

14. Md. Rule 2–632(f) provides, in part:

When an appeal is taken from an order or a judgment granting, dissolving, or denying an injunction, the court in its discretion may suspend, modify, restore, or grant an injunction during the pendency of the appeal upon such terms as to bond or otherwise as it considers proper for the security of the adverse party.

c) defined the exact location of the 10,000 square foot lot
by staking out the area.

Appellant further alleged that the "only work" it had not then
begun was "that which relates to the gate and fence enclosing
the 'fenced in area.' "

On August 12, 1999, Overland filed an "Opposition to Defen-
dant's Motion to Suspend Operation of Order as to Injunctive
Relief," and a motion to enforce the court's award of injunctive
relief. *See* Md. Rule 2–648(a) ("When a person fails to comply
with a judgment mandating action, the court may direct that
the act be performed by some other person appointed by the
court at the expense of the person failing to comply."). In its
opposition, appellee acknowledged that appellant had "done
some grading to the entranceway to the [New Lot]," but
added that it was "still experiencing accessibility problems"
and that "the slope to the entrance of the [New Lot] is not
eliminated as per [the court's] Order." Appellee disputed that
appellant had performed any other work as required by the
court's order.

In its motion to enforce, Overland repeated many of the
allegations set forth in its opposition, and requested the
following:

1. That this Honorable Court grant this Motion, and

2. That this Honorable Court appoint an outside contractor
 to complete the ... repairs and/or work, as set forth in
 [the court's] Order, and

3. That this Honorable Court order that [B & P] ... bear
 the expense of the appointment of said contractor, and

4. That this Honorable Court order that [B & P] place
 funds for the payment of said contractor for said repairs
 and/or work into the Registry of this Court by a date
 certain, and

5. That this Honorable Court award [Overland] attorney's
 fees incurred in obtaining said relief from this Court.

The circuit court held a hearing on the motions on Septem-
ber 28, 1999. Although the record of that hearing is not

before us, it appears that the court accepted additional evidence, including testimony. Appellee states in its brief that the court found that appellant had staked out the Additional Lot but had not performed the other relief that had been ordered. A written order, entered on November 15, 1999, evidences the remainder of the court's conclusions. It provides, in part:

> ORDERED, as this Court finds that the Defendant has not adhered to this Court's July 6, 1999 Order ..., this Court hereby appoints the following independent contractors: Action Fabricators and Erectors ... and Grading Specialists ... to perform certain repairs as hereinbelow [sic] ordered to the [Property], and it is further
>
> ORDERED, that Grading Specialists is hereby appointed by this Court to perform any and all grading necessary to the entranceways and roadways to allow reasonable access by the Plaintiff to the current fenced-in lot and the additional 10,000 square foot lot. That reasonable access shall be provided so that any and all wreckers or tow trucks of the Plaintiff have no difficulty entering or exiting both the current fenced-in lot and the additional 10,000 square foot lot, whether towing a vehicle or not towing a vehicle. That said grading work to be performed and completed by Grading Specialists encompasses grading work sufficient to provide a turn-around area for any and all said wreckers of the plaintiff and that said grading work shall be performed so that the gate to the current fenced-in lot opens and closes properly; and it is further,
>
> ORDERED, that Action Fabricators and Erectors is hereby appointed by this Court to perform any and all work necessary to fully and completely enclose all sides of the current fenced-in lot to provide uniform and consistent height of the current fenced-in lot; and it is further
>
> ORDERED, that the Defendant is hereby ordered to place into the Registry of the Circuit Court for Prince George's County the sum of Five Thousand Dollars ($5,000.00) within one (1) week of the date of this Order and that said sum ... shall be used to pay for the two (2) above-

mentioned contractors. The work to be performed by Grading Specialists and Action Fabricators and Erectors shall not exceed the sum of Five Thousand Dollars; and it is further

ORDERED, that a judgment for attorneys['] fees is hereby entered in favor of [Overland] against [B & P] representing reasonable attorney[s'] fees incurred by [Overland] for the prosecution of [this motion] in the amount of One Thousand Three Hundred Twelve Dollars and 50/100 Cents ($1,312.50).

B & P deposited the requisite check into the court registry on December 7, 1999.

A review of the November 1999 order reveals that it eliminated the need for counsel to monitor the progress of the work prescribed. Instead, the court named the contractors to perform the work and clarified what work was to be performed. The court's appointment of Action Fabricators and Erectors to effect full-fence enclosure of the New Lot dissipated any ambiguity concerning the fence and gate repairs. Although the phrase "reasonable access," and what was required to satisfy that concept, were somewhat vague in the July 1999 order, the November 1999 order defined what it termed "reasonable access." The latter order described such access as that which would allow Overland's trucks to enter and exit the New Lot and Additional Lot, with or without a vehicle in tow. Overland was also to be provided with a "turnaround area" for its trucks. Moreover, the proposed grading eliminated any concern B & P had about the impossibility of *eliminating* the slope in the access roads.

The mootness doctrine also allows for quick resolution of appellant's remaining claim. B & P argues that the court's order directing it to employ an engineer or surveyor to "stake out" the Additional Lot was not premised on an affirmative finding that the location of the Additional Lot had not been established. Indeed, Packard testified at trial that he had previously staked out that lot sometime around July 1998. According to appellee's brief, the court found at the Septem-

ber 1999 hearing that appellant had complied with the July 1999 order mandating that the Additional Lot be staked out. Consequently, we need not address the issue.

JUDGMENT OF ATTORNEYS' FEES VACATED. ALL OTHER JUDGMENTS AFFIRMED. CASE REMANDED TO THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID 80% BY APPELLANT, 20% BY APPELLEE.