717 A.2d 943

STATE HIGHWAY ADMINISTRATION

v.

DAVID A. BRAMBLE, INC.

No. 8, Sept. Term, 1998.

Court of Appeals of Maryland.

Sept. 17, 1998.

William A. Kahn, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen.; Scot D. Morrell, Asst. Atty. Gen., on brief), Baltimore, for petitioner.

Scott A. Livingston (Jamie B. Eisenberg, Rifkin, Livingston, Levitan & Silver, L.L.C., on brief), Baltimore, for respondent.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, RAKER, WILNER and CATHELL, JJ.

RODOWSKY, Judge.

This case is a contract interpretation dispute between the Maryland State Highway Administration (SHA) and David A. Bramble, Inc. (Bramble). Under Contract No. Q627–501–270 (the Contract), Bramble was to construct an interchange at the then on-grade junction of U.S. Route 301 and Maryland Route 213 in Kent County so that the latter road would overpass the former. At issue is the price that SHA must pay Bramble for the bituminous concrete, *i.e.*, asphalt, the latter used to pave temporary public roads for use during the period of construction. The swing between the two interpretations is approximately $203,000.

After SHA rejected Bramble's interpretation, the latter filed an appeal to the Maryland State Board of Contract Appeals (the Board). The Board decided in SHA's favor, for two reasons. First, it concluded that Bramble's interpretation of the Contract was unreasonable and that the Contract unambiguously supported SHA's position. Second, the Board

determined that, even if the Contract were ambiguous, the "patent ambiguity rule" precluded Bramble's remedy.[1]

On judicial review the Circuit Court for Kent County reversed, and SHA appealed to the Court of Special Appeals. In an unreported opinion, that court affirmed, determining that the Contract was ambiguous and that the patent ambiguity rule described by the Board was inapplicable.

SHA petitioned for certiorari which we granted. The petition raises two questions:

"(1) Did [the Board] correctly decide that the Contract unambiguously requires payment for the materials for construction of the temporary roadways at the prices prescribed for the same materials used to construct the permanent roadways?

"(2) Did [the Board] correctly decide that the patent ambiguity doctrine precludes Bramble from taking advantage of its interpretation of the Contract ... ?"

For the reasons set forth herein, we shall reverse the Court of Special Appeals on the first issue and direct affirmance of the Board's decision.[2]

Bids were solicited for the Contract in 1992. Bramble was awarded the Contract after submitting the lowest bid of $4,889,479.92. The scope of the work included construction of both temporary and permanent roads. Temporary and detour roads were to carry intersection traffic until the new interchange was completed.

---

1. In its opinion in the instant matter the Board described the patent ambiguity rule to be that, when a contractor is presented with an obvious contradiction or discrepancy in the contract documents, the contractor "is required to inquire about the discrepancy prior to bid or risk being awarded the contract and held to the State's interpretation." Citing a number of its own decisions, as well as *Avedon Corp. v. United States*, 15 Cl.Ct. 771 (1988), the Board said that "[i]f the contractor either knew or should have known of a patent ambiguity, a failure to seek clarification prior to bidding bars recovery."

2. Because of our resolution of the first issue, it is unnecessary for us to address the second issue presented by SHA, and we express no opinion on it.

The Contract consists of 133 drawings or plans, SHA's "Standard Specifications for Construction & Materials" (Jan. 1982), colloquially known as the "Red Book," (Std.Specs), and the completed, executed invitation for bids (the Proposal). The Proposal, comprised of nearly 500 pages, includes special provisions (Spl.Provs.), and a bid schedule that lists 221 separate items of work, of materials, or of both.

For the purpose of obtaining bids, the Proposal identifies each of the items by a number, a brief description of the item, and whether the method of payment for an item will be a lump sum or based upon a quantity actually used. The Contract's Proposal furnished to the bidders contained SHA's estimates of the quantities to be used in performing the Contract for those items that were not to be bid at a lump sum. These SHA estimates of quantity are not a limitation on payment after the work has been done.[3] In submitting its bid a contractor inserts in the prepared bid schedule a lump sum or unit price, as requested, and extends the unit prices by the estimated quantities.[4]

In the instant matter Bramble contends that SHA has agreed to pay for bituminous concrete used in furnishing temporary roads and detours at $100 per ton, pursuant to bid item 1005, whereas SHA contends, and the Board held, that the unit price for bituminous concrete used in the base of temporary roads is $27.70 per ton, per bid item 5004, and the

---

**3.** Standard Specs GP–2.03, "Interpretation of Quantities in Bid Schedule," reads:

"The quantities appearing in the prepared bid schedule are approximate only and are prepared for the canvassing of bids. Payment to the Contractor will be made only for the actual quantities of work performed or materials furnished in accordance with the contract. It is understood that the scheduled quantities of work to be done and materials to be furnished may each be increased, diminished, or omitted without in any way invalidating prices bid, except as hereinafter provided."

**4.** Bramble points out that, once the Contract is awarded, the items commonly referred to as "bid items" should be more properly referred to as "Contract pay items." We shall use the terminology, "bid items," which is employed by both parties in their briefs.

price for bituminous concrete used for the final surface of a temporary road is $32.75 per ton, per bid item 5003. In the bid schedule as completed by Bramble and accepted by SHA, the bid items involved immediately in the dispute, and associated items, appear as set forth below.

| Item Number | Approximate Quantity | Description of Item | Unit Price | Amounts |
|---|---|---|---|---|
| 1003 | Lump Sum | Maintenance of Traffic | | $ 75,000 |
| 1004 | 50 | Tons of Graded Aggregate For Subbase For Maintenance of Traffic | $15 | $ 750 |
| 1005 | 50 | Tons of Bituminous Concrete For Maintenance of Traffic | $100 | $ 5,000 |
| * * * * | | | | |
| 5001 | 44,800 | Square Yards of 6 Inch Base Course Using Graded Aggregate | $ 5.50 | $246,400 |
| * * * * | | | | |
| 5003 | 3,600 | Tons of Bituminous Concrete Surface, SC Final | $32.75 | $117,900 |
| 5004 | 12,100 | Tons of Bituminous Concrete Base | $27.70 | $335,170 |

Applying the ordinary rules of contract interpretation, we must construe this voluminous Contract as a whole. *Gordon v. Gordon,* 342 Md. 294, 313, 675 A.2d 540, 550 (1996). As we "walk" through the Contract we shall present the specific contentions of the parties concerning various provisions.

■ Initially, we note from the face of the bid schedule that SHA has not expressly stated that bid items 5003 and 5004 apply to both permanent and temporary roads. On the other hand, Bramble's reliance on bid item 1005 means that he seeks to be paid at the same $100 per ton price both for paving base and paving surface on temporary roads, whereas he agrees that on permanent roads the unit prices are both considerably lower than $100/ton and differ from one another.

"Maintenance of Traffic" is addressed in § 814 of the Red Book.[5] "This work pertains to the maintenance of traffic, both

---

5. Standard Spec. 814 falls within Part II of the Red Book, entitled "Technical Requirements." We shall follow the abbreviation format for

vehicular and pedestrian, on any facility affected by the work of the Contract." Std. Spec. 814.01. Maintenance of Traffic includes the traffic control plan, Std. Spec. 814.02, the traffic manager, Std. Spec. 814.03, temporary raised pavement markers, Std. Spec. 814.04, temporary concrete barriers, Std. Spec. 814.05, traffic barrier W beam, Std. Spec. 814.06, tubular markers, Std. Spec. 814.07, arrow boards, Std. Spec. 814.08, traffic control signs through construction areas, Std. Spec. 814.09, temporary impact attenuator (hydrocell), Std. Spec. 814.10, temporary impact attenuators, sand containers, Std. Spec. 814.11, temporary painted stripe marking, Std. Spec. 814.12, temporary pavement tape marking, Std. Spec. 814.13, and watchperson service, Std. Spec. 814.14. Common experience informs us that the types of labor and materials addressed in Std. Spec. 814 are not limited to temporary and detour roads. Indeed, whether the described services, materials or devices are employed, at various stages of the traffic control plan, on the old road, on the temporary road, or on the new road seems to be immaterial from a "Maintenance of Traffic" standpoint.

The circuit court and the Court of Special Appeals based their decisions on the rule of contract interpretation under which an ambiguous contract is construed against the party who drafted the contract. In this regard their analysis focused upon, and ended with, Std. Spec. 814.01.05. The context in which that standard specification appears is set forth in the margin.[6] Standard Spec. 814.01.05, in relevant part, reads (paragraph numbering added):

---

this section, as well as the format for Part I—the "General Provisions" of the Red Book, provided in the parties' briefs. Accordingly, citations to Part I of the Red Book bear the abbreviation "GP," for the "General Provisions," while the "Technical Requirements" bear no special abbreviation.

6. Standard Specs 814.01 through 814.01.04 read as follows:

"**814.01 DESCRIPTION.** This work pertains to the maintenance of traffic, both vehicular and pedestrian, on any facility affected by the work of the Contract.

¶ 1 "All work incident to maintenance of traffic, inclusive of traffic managers and flaggers; the relocating, maintaining and removal of existing traffic signs and other traffic devices; implementation of a Traffic Control Plan will be paid for at the Contract lump sum price for Maintenance of Traffic. This price shall include all materials, tools, labor and work of any kind incident to this item, except when otherwise specifically set up in the Proposal as a Contract pay item.

¶ 2 "If additional items for Maintenance of Traffic are included in the Contract, the basis of payment will be in accordance with the pertinent specification.

¶ 3 "If an item for Maintenance of Traffic does not appear in the Plans and Special Provisions, refer to the section on Maintenance of Work During Construction as outlined in the General Provisions for basis of payment.

¶ 4 "The material necessary in the construction of temporary or detour roads, the surfacing of temporary roadways, turnouts, etc. will not be included in the item Maintenance of Traffic but will be paid for at the respective unit

---

"**814.01.01** All work shall be in accordance with the latest issue of the Manual on Uniform Traffic Control Devices (MUTCD), Specifications, Plans, Special Provisions and as directed by the Engineer. Unless specifically set up in the Proposal as a Contract pay item, it shall include furnishing traffic managers and flaggers, relocating, maintaining and removing existing traffic signs and other traffic devices, and implementation of a Traffic Control Plan (TCP).

"**814.01.02 MATERIALS.** All materials used, whether temporary or permanent, shall meet the requirements of the Specifications, Plans, Standards and Special Provisions.

"**814.01.03 CONSTRUCTION REQUIREMENTS.** The contractor shall provide for the safe and expeditious movement of all traffic through the project in accordance with the TCP, Plans, Special Provisions and as directed by the Engineer.

"Equipment which is in use and requires temporary storage within the limits of the project and materials stored or stockpiled on the project shall be placed in a location which shall not be hazardous to the traveling public and as approved by the Engineer.

"**814.01.04 METHOD OF MEASUREMENT.** Maintenance of Traffic will not be measured but will be paid for on a lump sum basis. If additional Contract pay items for Maintenance of Traffic are provided for in the Proposal, the method of measurement will be in accordance with the pertinent specification."

price for excavation and the furnishing and placing of such materials as may be necessary for the construction of such temporary roads. Surfacing and removal of detour roads as shown on the Plans or called for in the Special Provisions will be measured and paid for at the unit price for Class I Excavation."

Bramble's position is that Maintenance of Traffic is bid item 1003 so that bid item 1005 is an additional item for Maintenance of Traffic. Thus, argues Bramble, a bidder is directed by ¶ 2 of Std. Spec. 814.01.05 to determine the "pertinent specification," and a bidder need not be concerned with reading ¶¶ 3 and 4. In the next step of its argument Bramble submits that the "pertinent specification" referred to in ¶ 2 is Spl. Traffic Prov. § 814, which we shall address, *infra.*

The Board gave two reasons for rejecting Bramble's claim. First, it concluded that Std. Spec. 814.01.05, ¶ 4, was "controlling and is not modified by the preceding second paragraph of that section as advanced by [Bramble]." Second, the Board considered Spl. Traffic Prov. § 814 and construed it differently than Bramble, as we discuss *infra.*

The purpose of ¶ 4 of Std. Spec. 814.01.05 is to make plain that the paving of temporary roads is not part of "Maintenance of Traffic" and that it will be paid for at the unit prices for the materials necessary for the construction of the temporary roads, which the Board concluded were the prices in bid items 5003 and 5004. The information supplied by ¶ 4 is not only presented in the negative, that is, where the method of payment for paving temporary roads will not be found, but also in the affirmative, that is, where it will be found.

The circuit court and the Court of Special Appeals concluded that the Board erred in that interpretation. By looking only at the negative aspect of the fourth paragraph, the Court of Special Appeals focused on the words, "the item," preceding "Maintenance of Traffic," and construed the phrase to refer in this Contract exclusively to bid item 1003, "Maintenance of Traffic." Reasoning that the Contract thereby was ambiguous as to "whether the price for temporary roads should be

derived from item 1005, ['tons of bituminous concrete for maintenance of traffic'] or from some other item," the intermediate appellate court, as did the circuit court, construed the ambiguity against SHA. That terminated their analysis. In this latter aspect, those courts erred. Assuming that ¶ 4 of Std. Spec. 814.01.05 is not in itself controlling, contrary to the Board's conclusion, then "additional items for Maintenance of Traffic are included in the Contract," Std. Spec. 814.01.05, ¶ 2, and one must then determine the "pertinent specification," per ¶ 2.

Bramble contends that Spl. Traffic Prov. § 814 is the "pertinent specification." It is found in seventy some pages of the executed Proposal that are headed "Traffic" and that relate to traffic signs, signals, barriers, and lanes during construction. Spl. Traffic Prov. § 814 has two parts. One part is headed as set forth below:

"<u>BITUMINOUS CONCRETE FOR MAINTENANCE OF TRAFFIC GRADED AGGREGATE FOR SUBBASE FOR MAINTENANCE OF TRAFFIC.</u>"

The other part deals with "<u>CONCRETE BARRIERS.</u>"

The bituminous concrete part reads as follows:

"<u>Description:</u>

"The work covered under this Special Provision shall consist of furnishing and placement of bituminous concrete pavements and graded aggregate for subbase in temporary locations for maintenance of traffic as directed by the Engineer.

"<u>Materials:</u>

. . . .

"<u>Construction Requirements:</u>

. . . .

"The Engineer shall indicate the lengths, widths, and depths, and required number of layers of which materials to be used.

"<u>Method of Measurement:</u>

. . . .

"Basis of Payment:

"The contract unit price bid per ton for the item 'Bituminous Concrete for Maintenance of Traffic' and 'Graded Aggregate for Subbase for Maintenance of Traffic,' complete in place, shall include the cost of furnishing, hauling and placing all materials, for all labor, tools, and equipment necessary to complete the item."

The question of interpretation presented by this case involves the description of the work covered by the above. Bramble contends that furnishing and placing bituminous concrete "in temporary locations for maintenance of traffic as directed by the Engineer" refers to the initial construction of temporary roads. The Board, however, found that

"the underlying Contract specification language in dispute ... means that temporary bituminous concrete necessary for patching, pothole repair and miscellaneous repair tie-ins, as directed in the field by the Engineer during the course of the project as problems arise, NOT the bituminous concrete needed to create the detour and temporary roads. That material is to be paid for pursuant to the bid price provided for items 5003 and 5004."

SHA contends that it is unreasonable to construe the description of the work under Spl. Traffic Prov. § 814 to include the original construction of the temporary roads, because the temporary roads are fully described in the plans to be followed by the contractor. The location, elevation, length, and width of the temporary roads are determined by, and set forth on, the drawings that are part of the traffic control plan. The depth and required number of layers of materials to be used in paving the temporary roads in the process of their construction are prescribed on the plans. SHA submits that the phrase, "as directed by the Engineer," in the context of Spl. Traffic Prov. § 814, plainly addresses work that is not shown on the plans. This is because the plans cannot show in advance where the need will arise "for patching, pothole repair and miscellaneous tie-ins." Such incidental work "in tempo-

rary locations" necessarily must be "as directed by the Engineer."

The Board's reading of the description of the work in Spl. Traffic Prov. § 814 is consistent with that special provision's "Construction Requirements" that state "[t]he Engineer shall indicate the lengths, widths, and depths, and required number of layers of which materials to be used." The plans, however, provide pavement detail for detour roads and temporary auxiliary lanes. The pavement legend requires the contractor to lay temporary roads from the top of the subgrade with a six inch base course using graded aggregate, on which is placed a three and one-half inch (nominal) bituminous concrete base, band BF. The surface is a one and one-half inch (nominal) bituminous concrete, band SC. The plans and Spl. Traffic Prov. § 814 are harmonized by reading "as directed by the Engineer" to relate to the interstices of the Contract, and not to that which is spelled out in it.

Special Traffic Prov. § 814, as interpreted by the Board, is also compatible with the estimated fifty tons of aggregate base and of bituminous concrete that was used by SHA in the bid schedule for Maintenance of Traffic. Bramble's owner admitted that, in bid preparation, he knew that fifty tons underestimated the quantity of temporary road paving materials, and he realized that at least 1,000 tons would be required. In fact, as reflected by Bramble's claim for payment at $100/ton, 2757.44 tons of bituminous concrete were used for temporary roads. Bramble's owner testified that he was not particularly concerned about SHA's obvious underestimation of quantity because he considered that the matter would be subject to an equitable adjustment under the "VEQ" clause.[7] This explana-

---

7. The reference is to Std. Specs GP–4.03, "Variations in Estimated Quantities." It reads in relevant part:

"Where the quantity of a pay item in this contract is an estimated quantity and where the actual quantity of such pay item varies more than 25 percent above or below the estimated quantity stated in this contract, an equitable adjustment in the contract price shall be made upon demand of either party. The equitable adjustment shall be based upon any increase or decrease in costs due solely to the

tion for not seeking clarification does nothing to undermine the Board's interpretation that Spl. Traffic Prov. § 814 did not refer to the construction of temporary roads, because the explanation does not account for the phrase, "as directed by the Engineer."

Bramble's argument ultimately rests on the proposition that all work under any SHA contract is "as directed by the Engineer" because the "plans were authorized, signed, and issued by the SHA Engineer." This argument is not a reasonable construction of the Special Provision.

For example, Std. Spec. 814.01.01 states that "[a]ll work shall be in accordance with the latest issue of the Manual on Uniform Traffic Control Devices (MUTCD), Specifications, Plans, Special Provisions and as directed by the Engineer...." In this context, "as directed by the Engineer" clearly has a meaning different from "Specifications," "Plans," and "Special Provisions." If it did not, the phrase would be redundant. Because this Court will ordinarily avoid interpreting contracts in a way that renders its provisions superfluous, *Bausch & Lomb Inc. v. Utica Mutual Ins. Co.*, 330 Md. 758, 782, 625 A.2d 1021, 1033 (1993), the phrase, "as directed by the Engineer," as it is used in Spl. Traffic Prov. § 814, should not be read to be synonymous with the directions and specifications found in the Contract plans.

Special Traffic Prov. 17, "Maintenance of Project," which Bramble cites for its use, in part, of the future tense, actually supports the Board's decision. Special Traffic Prov. 17 includes in the scope of the work through the life of the project "[p]ot hole repair as directed," and states that the work "will be as directed by the Engineer." Other types of work included in Spl. Traffic Prov. 17 include the pick up of debris, the mowing of grass, and the sweeping of roadways. Obviously,

---

variation above 125 percent or below 75 percent of the estimated quantity."

Whether, under the VEQ clause, SHA could have equitably adjusted temporary road paving down to the prices in bid items 5003 and 5004 is not presented in this case.

the locations where these tasks are to be performed from time to time cannot be reflected in advance on the plans, but "will be as directed by the Engineer."

Bramble's position that work "as directed by the Engineer" fully embraces work specified in the plans in addition to work not set forth in the plans is belied by contract provisions in which "as directed by the Engineer" is used in contradistinction to work specified in the plans. For example, in that part of Spl. Traffic Prov. § 814, headed, "Concrete Barriers," the bidder is referred to Std. Spec. 814.05, "Temporary Concrete Barrier for Maintenance of Traffic." Standard Spec. 814.05.01 describes the work as "furnishing, placing, resetting and removal of precast concrete barriers for temporary use during construction along highways, streets and *at locations indicated on the Plans or as directed by the Engineer.*" (Emphasis added). Temporary road pavement markers are to be completed in place, "as indicated on the approved Traffic Control Plan or as directed by the Engineer." Std. Spec. 814.04.01. The same distinction between plans and the direction of the engineer is made for locating a traffic barrier W beam, Std. Spec. 814.06.01, for locating tubular markers for maintenance of traffic, Std. Spec. 814.07.01, and in other specifications involving Maintenance of Traffic devices that may require shifts of location as the work progresses or circumstances dictate. The same reasoning applies to filling potholes in temporary roads.

 Judicial review of administrative agency decisions under the Administrative Procedure Act is narrow. *United Parcel Serv., Inc. v. People's Counsel,* 336 Md. 569, 576, 650 A.2d 226, 230 (1994). The reviewing court determines only " '(1) the legality of the decision and (2) whether there was substantial evidence from the record as a whole to support the decision.' " *Department of Labor, Licensing & Regulation v. Hider,* 349 Md. 71, 77–78, 706 A.2d 1073, 1076 (1998) (citing *Baltimore Lutheran High Sch. Ass'n v. Employment Sec. Admin.,* 302 Md. 649, 662, 490 A.2d 701, 708 (1985)). The reviewing court is "under no constraint to affirm an agency

decision premised solely upon an erroneous conclusion of law." *Insurance Comm'r v. Engelman,* 345 Md. 402, 411, 692 A.2d 474, 479 (1997).

■ The question of whether a contract is ambiguous ordinarily is determined by the court as a question of law. *See JBG/Twinbrook Metro Ltd. Partnership v. Wheeler,* 346 Md. 601, 625, 697 A.2d 898, 911 (1997) (stating that "the interpretation of a written contract is ordinarily a question of law for the court.") (citing *Suburban Hosp., Inc. v. Dwiggins,* 324 Md. 294, 306, 596 A.2d 1069, 1075 (1991)). Thus, the fact that witnesses for Bramble testified, in effect, that Bramble's interpretation was reasonable while SHA relied primarily on the arguments of counsel is immaterial under the facts of this case.

For the reasons stated above the provision that the courts below found to be ambiguous is not controlling, and the provision that is controlling is not ambiguous. Bramble's competing construction of Spl. Traffic Prov. § 814 is not consistent with the Contract as a whole. There was no error of law by the Board.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT FOR THE ENTRY OF A JUDGMENT REVERSING THE JUDGMENT OF THE CIRCUIT COURT FOR KENT COUNTY AND REMANDING THIS ACTION TO THE CIRCUIT COURT FOR KENT COUNTY WITH INSTRUCTIONS TO AFFIRM THE DECISION OF THE MARYLAND STATE BOARD OF CONTRACT APPEALS.**

**COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY THE RESPONDENT, DAVID A. BRAMBLE, INC.**