**EAGLEHEAD CORPORATION, et al., Plaintiffs,**

v.

**CAMBRIDGE CAPITAL GROUP, INC., et al., Defendants.**

**No. AMD 01–2055.**

United States District Court,
D. Maryland.

Oct. 31, 2001.

John Paul Markovs, Samek & McMillan, P.C., Rockville, MD, for Plaintiffs.

Arnold S. Albert, Law Office, Washington, DC, for Defendants.

## MEMORANDUM

DAVIS, District Judge.

This is a diversity action brought by Frank P. Ellis ("Ellis") and his various corporate entities, namely, Eaglehead Corporation; Hamptons, LLC; Linganore

Homes, Inc.: and Linganore Development Group (collectively "plaintiffs").[1] The defendants include Cambridge Capital Group, Inc. ("CCGI"); Cambridge Holdings Group, Inc. ("CHGI"); and their president, Eric Cummings ("Cummings") (collectively "Cambridge"). The parties' dispute arises from plaintiffs' attempts to obtain one or more secured commercial loans from Cambridge. Plaintiffs' claims are for breach of contract, breach of implied duty of good faith and fair dealing, fraud and unjust enrichment. All of these claims flow from Cambridge's alleged default on two loan commitments. Plaintiffs seek compensatory and punitive damages, equitable relief, costs and attorneys' fees. CHGI has asserted a counterclaim against plaintiffs, contending that plaintiffs defaulted on two promissory notes.

Now pending are plaintiffs' motion for summary judgment on Count I (Breach of the September 16, 1999 Loan Commitment), Count II (Breach of the February 7, 2000 Loan Commitment) and Count III (Breach of Implied Duty of Good Faith and Fair Dealing), and defendants' cross-motion for summary judgment as to Counts I and II and to dismiss Count III for failure to state claim.[2] The issues have been fully briefed and counsel have been heard in oral argument. For the reasons discussed below, I shall grant defendants' cross-motion for summary judgment on counts I and II and grant defendants' motion to dismiss count III for failure to state a claim. I shall also grant defendants' motion for leave to amend the answer. Plaintiffs' motion shall be denied.

## I.

### The 1999 Loan Commitment

Beginning in the summer of 1999, plaintiffs sought to obtain a loan from Cambridge to refinance and acquire certain real estate. Plaintiffs offered improved and unimproved real estate as the primary collateral to secure the loan.[3] On September 16, 1999, Cambridge issued to plaintiffs a loan commitment agreement ("1999 Loan Commitment") and, on September 18, 1999, the parties executed the agreement.

Pursuant to the 1999 Loan Commitment, Cambridge agreed to provide $9.5 million in financing to plaintiffs. 1999 Loan Commitment at ¶ 1. The disbursement of this amount was to be in two phases: (1) $3.25 million was to be funded within 15 days; and (2) $6.25 million was to be funded within 75 days. *Id.* at ¶ 4. In exchange for the loan commitment, plaintiffs were required to pay a non-refundable loan commitment fee in the amount of $60,000. *Id.* at ¶¶ 6, 38. This fee was to be paid in two phases: (1) $25,000 upon the execution by plaintiffs of the Loan Commitment, and (2) $35,000 within thirty days following the execution by plaintiffs of the Loan Commitment. *Id.* at ¶ 38. The funding of the loan was conditioned upon plaintiffs' compliance with the terms of the loan commitment. The commitment stated that the loan was "contingent on [plaintiffs] having the capability, *in the sole and absolute discretion of [Cambridge],* of repaying the

---

1. Ellis is the president of Eaglehead and Linganore Homes, the general partner of Linganore Development Group, and the managing member of Hamptons. He is also the primary owner of Eaglehead, Linganore Homes, Hamptons and Linganore Development Group.

2. In the alternative, defendants argue that Count I should be dismissed because it is barred by defenses of estoppel and release.

3. Plaintiffs contend that a loan application was submitted to CCGI for financing in the amount of $10 million. CCGI claims, however, that the application was for a principal amount of $9.5 million.

Loan in accordance with its terms." *Id.* at ¶ 9 (emphasis added).

### The Appraisals

Plaintiffs' receipt of funding was expressly conditioned on their submission of significant financial data and related documents. Specifically, in order to document the value of the collateral securing the proposed funding, plaintiffs submitted an appraisal dated November 19, 1998 ("1998 Appraisal"). The 1998 Appraisal valued plaintiffs' real estate holdings at $35.2 million. Cambridge concluded, however, that the 1998 Appraisal was unacceptable because it was out-of-date at the time of the execution of the 1999 Loan Commitment in September 1999. Although disputed by plaintiffs, Cambridge maintains that due to the insufficiencies in the 1998 Appraisal, plaintiffs were requested to submit a new appraisal. *See* Letter dated September 21, 1999 from Cummings to Ellis.

Plaintiffs' updated appraisal ("updated appraisal"), submitted on September 29, 1999, reflected the claimed values of their real estate holdings as to phase I of the 1999 Loan Commitment. Plaintiffs allege that the updated appraisal reflected an increase in the properties' values. Ellis Aff. at ¶ 21. Cambridge contends, however, that the updated appraisal indicated that the value of certain properties had dropped substantially.

### The Addenda

On or about September 28, 1999, the parties executed the "Addendum for Collateralized Loan Financing" ("First Addendum"). The First Addendum provided financing in the amount of $1.35 million to fund the purchase of a property known as the "Skinner Farm." On October 6, 1999, the parties executed the "Second Adden-

dum to Loan Collateralized Financing" ("Second Addendum"). The Second Addendum increased the financing provided by the First Addendum from $1.35 million to $1.45 million. The parties closed the loan provided for in the addenda on or about February 7 or 11, 2000.[4] Contemporaneously with the closing of the loan, the parties entered into two agreements relevant to this case: (1) a "Financing Terms Agreement" and (2) a "General Release and Estoppel Agreement."

As discussed *infra*, the parties vigorously dispute the intent and purpose of the addenda. According to Cambridge, the addenda modified the 1999 Loan Commitment, reducing the $9.5 million committed loan amount to $1.45 million. Plaintiffs contend, however, that the addenda simply provided "interim financing," and that Cambridge was still obligated under the 1999 Loan Commitment to fund the balance of the $9.5 million within 120 days. The parties pointedly dispute the reasons for the execution of the addenda. Plaintiffs claim that the First Addendum was necessitated by Cambridge's inability to fund the loan as contemplated in the 1999 Loan Commitment. Cambridge maintains, however, that the parties entered into the addenda in order to accommodate plaintiffs' inability to demonstrate ownership of sufficient collateral to secure the entire $9.5 million.

### The 2000 Loan Commitment

On February 7, 2000, defendants issued a new loan commitment for collateralized financing in the amount of $9 million ("2000 Loan Commitment"). 2000 Loan Commitment at ¶ 1. Pursuant to the 2000 Loan Commitment, the loan was to be funded "within approximately 60 days"

---

4. Plaintiffs contend that defendants made the loan on February 7, 2000; defendants assert the date was February 11, 2000.

from its execution. *Id.* at ¶ 4. Cambridge was to provide funding in two stages as follows: $5 million no later than March 20, 2000, and $4 million no later than April 25, 2000. *Id.* The 2000 Loan Commitment conditioned the funding upon "performance and/or satisfaction of the terms, provisions and conditions of the Loan Commitment which performance and/or satisfaction will be based on the sole and absolute discretion of [Cambridge]. . . ." *Id.* at ¶ 26.

## II

Pursuant to Fed.R.Civ.P. 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is material for purposes of summary judgment, if when applied to the substantive law, it affects the outcome of the litigation. *Id.* at 248, 106 S.Ct. 2505. Summary judgment is also appropriate when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

A party opposing a properly supported motion for summary judgment bears the burden of establishing the existence of a genuine issue of material fact. *Anderson,* 477 U.S. at 248–49, 106 S.Ct. 2505. "When a motion for summary judgment is made and supported as provided in [Rule 56], an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's re-sponse, by affidavit or as otherwise provided in [Rule 56] must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). *See Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505; *Shealy v. Winston,* 929 F.2d 1009, 1012 (4th Cir.1991). Of course, the facts, as well as the justifiable inferences to be drawn therefrom, must be viewed in the light most favorable to the nonmoving party. *See Matsushita Elec. Indust. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The court, however, has an affirmative obligation to prevent factually unsupported claims and defenses from proceeding to trial. *See Felty v. Graves–Humphreys Co.,* 818 F.2d 1126, 1128 (4th Cir.1987).

When both parties file motions for summary judgment, as here, the court applies the same standards of review. *Taft Broadcasting Co. v. United States,* 929 F.2d 240, 248 (6th Cir.1991); *ITCO Corp. v. Michelin Tire Corp.,* 722 F.2d 42, 45 n. 3 (4th Cir.1983) ("The court is not permitted to resolve genuine issues of material facts on a motion for summary judgment—even where ... both parties have filed cross motions for summary judgment") (emphasis omitted), *cert. denied,* 469 U.S. 1215, 105 S.Ct. 1191, 84 L.Ed.2d 337 (1985).

### III.

#### A.

In count I, plaintiffs claim that Cambridge breached the 1999 Loan Commitment by failing to fund approximately $8.05 million (the balance of the proposed $9.5 million loan). Defendants admit that they never funded the $9.5 million loan; defendants, however, maintain that they fulfilled their obligations under the 1999

Loan Commitment, as amended.[5]

At its core, this is a dispute over contract interpretation. Defendants argue that the addenda executed subsequent to the execution of the 1999 Loan Commitment clearly and unambiguously modified the amount of the loan. Specifically, defendants claim that the addenda reduced the principal amount of the loan from $9.5 million to $1.45 million (the first addendum reducing the loan to $1.35 million, and the second addendum increasing it to $1.45 million). Therefore, because there is no dispute that defendants funded the $1.45 million, defendants argue that all of their obligations under the 1999 Loan Commitment, as amended by the addenda, have been fulfilled and consequently, they are entitled to judgment as a matter of law as to plaintiffs' claims under count I of the complaint. Plaintiffs, however, maintain that the two addenda did not reduce the amount of the loan. Plaintiffs contend that the addenda merely provided for immediate interim financing to permit the plaintiffs to acquire the Skinner Farm.

■ Maryland follows the objective law of contract interpretation. *See Taylor v. Nationsbank, N.A.*, 365 Md. 166, 178, 776 A.2d 645 (2001) (citing *Adloo v. H.T. Brown Real Estate, Inc.*, 344 Md. 254, 266, 686 A.2d 298 (1996)). As reiterated in *Taylor*,

> [W]hen the language of the contract is plain and unambiguous there is no room for construction, and a court must presume that the parties meant what they expressed.

365 Md. at 179, 776 A.2d 645 (internal quotations omitted). Whether a contract is ambiguous is determined by the court as a matter of law. *State Highway Admin.*

*v. David A. Bramble, Inc.*, 351 Md. 226, 239, 717 A.2d 943 (1998); *Rothman v. Silver*, 245 Md. 292, 296, 226 A.2d 308 (1967) ("[I]f a written contract is susceptible of a clear, unambiguous and definite understanding ... its construction is for the court to determine.").

■ The Court of Appeals of Maryland, in *Heat & Power Corp. v. Air Products & Chemicals, Inc.*, 320 Md. 584, 578 A.2d 1202 (1990), has set forth the proper analysis for courts to utilize when determining whether a contract is ambiguous. The court stated:

> [T]he trial judge must first consider "the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution." Second, with this background, the judge examines the four-corners of the contract to determine if the contract is unambiguous. An ambiguity exists when, to a reasonably prudent person, the language used in the contract is susceptible of more than one meaning. If the contract is ambiguous, the court must consider any extrinsic evidence which sheds light on the intentions of the parties at the time of the execution of the contract.

*Id.* at 596–97, 578 A.2d 1202 (citations omitted).

■ Applying these basic tenets of contract interpretation to the 1999 Loan Commitment and its addenda, it is patently clear that the addenda unambiguously modified the principal amount of the loan provided for in the 1999 Loan Commitment. As already stated, paragraph 1 of the unmodified 1999 Loan Commitment provided that "[t]he loan amount ("Loan") [would] be in the principal amount of

---

**5.** Defendants also maintain that regardless of the alleged reduction of the amount of the loan, defendants were not obligated to fund the loan because plaintiffs failed to comply with the terms of the loan commitment, thereby negating any obligation to fund the $9.5 million loan.

$9,500,000.00." 1999 Loan Commitment at ¶ 1. Cambridge argues that the first addendum clearly and unambiguously modified this principal amount, reducing it to $1.35 million. The first addendum states:

> Paragraph 1 (and elsewhere) of the Loan Commitment is hereby amended to provide as follows:

> The loan amount ("Loan") will be in the principal amount of $1,350,000.00.

First Addendum at ¶ 2. Similarly, Cambridge maintains that the second addendum further unambiguously expresses the parties' intentions again modifying the principal amount:

> Paragraph 1 of the Loan Commitment is amended to *Increase* the principal amount of the Loan to $1,450,000.00.

Second Addendum at ¶ 2 (emphasis added).

Plaintiffs, however, dispute defendants' interpretation of the 1999 Loan Commitment, as amended by the addenda, maintaining that the addenda did not affect the defendants' obligation to fund the entire $9.5 million loan. Plaintiffs contend that the addenda simply provided for interim financing in the amount of $1.45 million and did not reduce the $9.5 million loan. Plaintiffs argue that defendants were still obligated to lend the balance of the $9.5 million. Plaintiffs cite one clause for support, paragraph 11, which states as follows:

> Lender will finalize and close the balance of the financing set forth in the Loan Commitment, dated September 18, 1999, within 120 days of closing of the

first phase of this financing in the amount of $1.35 million.

First Addendum at ¶ 11.[6]

Plaintiffs' approach to contract interpretation is untenable in the extreme. Paragraph 11 clearly and unambiguously reflects the parties' intention that the $1.45 million would be the first phase of financing. Paragraph 11 also demonstrates the parties' intention to finalize financing and close on that financing in an amount equal to the balance of the 1999 Loan Commitment. And, paragraph 11 provides that the parties would "finalize" the second phase of financing and close on the financing within 120 days after closing on the first phase. Thus, Cambridge has offered the only reasonable interpretation of paragraph 11: paragraph 11 is merely a statement of the parties' recognition that they would work towards finalizing the second phase of financing in an amount equal to the balance of the 1998 Loan Commitment.

Not only is the plain language of the 1999 Loan Commitment and the addenda patently clear, the parties' subsequent written agreements are entirely consistent with the language of the addenda reducing the amount of the $9.5 million loan. Cambridge cites the Financing Terms Agreement, executed on February 11, 2000, in which the plaintiffs clearly and unambiguously acknowledged the reduction in the principal loan amount. This agreement provided the following unambiguous statement of intent:

> [Plaintiffs applied] to [Cambridge] ... for a loan in the principal sum of $9,500,000.00. [Plaintiffs have] received

---

**6.** Plaintiffs also cite letters drafted several months after the execution of the addenda. *See* Letter dated January 6, 2000 from Ellis to Cummings; Letter dated March 30, 2000. In these letters, Ellis documents his alleged understanding of the addenda as reducing only phase I of the loan, from $3.25 million to

$1.45 million. "[C]lear and unambiguous language, [however], will not give [way] to what parties thought that the agreement meant or intended it to mean." *Taylor*, 365 Md. at 179, 776 A.2d 645 (quotations omitted).

approval for this financing at this time in the maximum principal amount of $1,450,000.00.

Financing Terms Agreement at ¶ 3.

Cambridge also cites the 2000 Loan Commitment executed at the time the parties closed the $1.45 million loan. The 2000 Loan Commitment provided for financing in the amount of $9 million. Cambridge argues that the 2000 Loan Commitment further demonstrates that Cambridge was no longer obligated to fund the $9.5 million loan under the 1999 Commitment—if a binding commitment to fund the balance of the $9.5 million already existed, there would have been no need (or motivation) for plaintiffs to enter into the 2000 Loan Commitment.

The third document cited by Cambridge is the "General Release and Estoppel Agreement" ("release agreement"), which was executed contemporaneously with the closing on the $1.45 million loan in February 2000 to the amended 1999 Loan Commitment. The release agreement states:

> Borrower hereby releases, acquits, and discharges the Lender ... from any and all known, latent and unknown and/or undiscovered claims, actions and causes of action of whatever kind or nature, from the beginning of time to the date hereof, arising out of or connected with the Loan, the Note, the Deeds of Trust, the Loan Documents and all transactions relative thereto and/or arising therefrom.

General Release and Estoppel Agreement at ¶ 5. Cambridge asserts that the release agreement indicates the parties' satisfaction with their course of dealing as of the closing of the loan. Further, the release agreement is itself an enforceable contract, which under Maryland law would absolve Cambridge from any liability arising out of the 1999 Loan Commitment.[7] An examination of this series of agreements shows that the parties' intention is abundantly clear as a matter of law; moreover, even if there is some ambiguity inherent in the discrete documents, a reasonable jury could reach but one interpretation of the series of documents comprising the parties' agreement. The parties originally entered into a loan commitment that contemplated funding in the amount of $9.5 million in September 1999. The parties modified the 1999 Loan Commitment twice, ultimately reducing the principal amount of the loan to $1.45 million. Nevertheless, they recognized that at some point in the future they hoped to finalize financing for the balance of the loan. Then, in February 2000, the parties closed on the $1.45 million loan. Contemporaneously with the closing on the loan in February 2000, plaintiffs signed an acknowledgment that they had only received approval for financing in the amount of $1.45 million; they signed an agreement releasing defendants from any claims relating to the 1999 Loan Commitment which generated the $1.45 million loan. Finally, in keeping with paragraph 11 of

---

**7.** In Maryland, unambiguous exculpatory clauses are generally held to be valid in the absence of legislation to the contrary. *Attorney Griev. Comm'n v. Owrutsky,* 322 Md. 334, 350, 587 A.2d 511 (1991); *Sullivan v. Mosner,* 266 Md. 479, 295 A.2d 482, (1972). There are generally only three exceptions to this rule; they are: (1) when the party protected by the clause intentionally causes harm or engages in acts of reckless, wanton, or gross negligence; (2) when the bargaining power of one party to the contract is so grossly unequal so as to put that party at the mercy of the other's negligence; and (3) when the transaction involves the public interest. *Wolf v. Ford,* 335 Md. 525, 531–32, 644 A.2d 522 (1994). Plaintiffs have not submitted any support for application of one of these exceptions. Nor have plaintiffs submitted any argument as to why the Release Agreement would not bar their current claim.

the First Addendum, the parties renegotiated the financing terms of the "second phase" of the loan and executed the 2000 Loan Commitment, providing for a loan in the amount of $9 million.

Moreover, even if I were to accept plaintiffs' interpretation of paragraph 11 (that it obligated defendants to lend the balance of the $9.5 million loan), plaintiffs' argument is still without merit. On February 11, 2000, the very same day the parties closed on the $1.45 million loan, plaintiffs signed a release and the parties renegotiated and executed a new loan commitment regarding the balance of the $9.5 million loan. *See* 2000 Loan Commitment. The 2000 Loan Commitment set forth the terms under which the balance of the $9.5 million loan would be funded, and provided for an additional $1 million. Plaintiffs cannot now sue under the 1999 Loan Commitment, as they have released the defendants and negotiated a new loan commitment. Accordingly, I shall grant Cambridge's motion as to count I.[8]

### B.

In count II, as an alternative to their theory pressed under count I, plaintiffs

contend that Cambridge breached the 2000 Loan Commitment by failing to fund the $9 million loan provided for therein. Defendants, however, argue that their obligation to fund the $9 million was extinguished by plaintiffs' failure to comply with the terms of the 2000 Loan Commitment. Specifically, Cambridge contends that the obligation to fund the $9 million loan was contingent upon plaintiffs providing a current appraisal regarding the collateral pledged and that plaintiffs failed to submit such a satisfactory appraisal.

Plaintiffs argue that they were only required to submit additional documents, including a satisfactory appraisal, if Cambridge notified them of the need for the documents within ten days of the execution of the 2000 Loan Commitment. Plaintiffs cite the following provisions (hereinafter "the ten-day provisions") of the 2000 Loan Commitment:

> If requested in writing within ten (10) days after finalization of the Loan Commitment (as to [the first phase in the amount of $5 million, herein referred to as] Eaglehead II).... Lender shall receive all necessary assurances, reports and opinions relating to the Collateral as

---

8. Plaintiffs also argued that the addenda were necessitated due to Cambridge's default on the 1999 Loan Commitment. This argument is completely unavailing. First, plaintiffs' allegations run counter to the following provisions included within the addenda: "[b]orrower hereby acknowledges that *Lender has been in full compliance with all of its obligations* pursuant to this Loan Commitment." First Addendum at ¶ 12 (emphasis added); Second Addendum at ¶ 5 (emphasis added). Again, because the plain language of the addenda is clear, the court must presume that the parties meant what they expressed. *See Taylor*, 365 Md. at 178, 776 A.2d 645 (quotations omitted). Second, even if Cambridge had been in default, plaintiffs chose to renegotiate instead of suing. Consequently, plaintiffs are bound by the 1999 Loan Commitment as amended. And, plaintiffs' allegations re-

garding the negotiations and communications leading up to the execution of the addenda are now barred by the parol evidence role. In the absence of fraud, duress or mistake, parol evidence is not admissible to vary or contradict the terms of a written instrument. *See, e.g., Equitable Trust Co. v. Imbesi*, 287 Md. 249, 271, 412 A.2d 96 (1980); *Kermisch v. Savings Bank of Balto.*, 266 Md. 557, 560, 295 A.2d 776 (1972); *Foreman v. Melrod*, 257 Md. 435, 442, 263 A.2d 559 (1970); *Rinaudo v. Bloom*, 209 Md. 1, 9–10, 120 A.2d 184 (1956); *Markoff v. Kreiner*, 180 Md. 150, 154–55, 23 A.2d 19 (1941). "All prior and contemporaneous negotiations are merged in the written instrument, which is treated as the exclusive medium for ascertaining the extent for their obligations." *Foreman*, 257 Md. at 441, 263 A.2d 559 (citations omitted) (internal quotation marks omitted).

stipulated in this Loan Commitment. ¶ 31.

If requested in writing within ten (10) days. . . . Borrower will furnish Lender with authentic copies of any and all licenses, permits, bonds, approvals, and authorizations as may be required, in the sole opinion of Lender, for the ownership, development and operation of the Collateral. ¶ 32.

If requested in writing within ten (ten) days. . . . Borrower agrees to endorse or furnish any other agreements, documents, contracts, collateral, affidavits, legal opinions or materials. . . . ¶ 33.

Plaintiffs contend that Cambridge failed to request a new appraisal prior to the passage of the ten-day deadline.[9]

■ Cambridge answers that the ten-day provisions did not constrain defendants' prerogative to reject the submitted appraisals or request a current appraisal. I agree. The plain language of the 2000 Loan Commitment clearly conditioned the funding of the loan on Cambridge's approval of a current appraisal. The 2000 Loan Commitment provides as follows: "[a]t and in all events, this Loan Commitment is subject to Lender's approval, in its sole and absolute discretion, of a *current* appraisal (or, at Lender's option, a confirming appraisal) of the Collateral." 2000 Loan Commitment at ¶ 26 (emphasis added).[10] Plaintiffs' application of the ten-day provisions to Cambridge's request for a new appraisal would render the contingency outlined in paragraph 26 mere surplusage. Moreover, nothing in the ten-day provisions references *appraisals* or other financial data requested by Cambridge. Rather, the ten-day provisions refer primarily to reports, licenses and bonds and the sort of documents with which they are concerned.

Plaintiffs also appear to argue that the ten-day provisions apply categorically to schedule B of the 2000 Loan Commitment. Under schedule B, Cambridge required plaintiffs to submit the following data as a condition precedent to the funding of the

---

9. Whether Cambridge requested a new appraisal within ten days is greatly disputed. Cambridge alleges that it repeatedly informed plaintiffs that the extant appraisals were insufficient. In addition, Cambridge claims that it sent a letter within the alleged ten-day time frame referencing the need for a new appraisal. In support, Cambridge submitted a letter dated February 14, 2000 addressed to Ellis from Cummings ("the Valentine's Day letter"). The Valentine's Day Letter, written just three days after the execution of the 2000 loan commitment, clearly references the need for a new appraisal. *See* Valentine's Day Letter. Plaintiffs, however, claim that Cambridge contrived this letter solely for the purposes of this litigation. Plaintiffs cite the caption of the letter that refers to "Eaglehead Corporation *et al.*," a phrase only used in the context of this litigation. Plaintiffs also note that the Valentine's Day letter, unlike other correspondence from Cambridge, was not sent via facsimile. In the view that I take of the matter, this dispute, though troubling, is immaterial.

10. Both parties agree that plaintiffs submitted two appraisals during the course of dealing over the loans. Cambridge maintains that it never approved the appraisals submitted by plaintiffs; Cambridge alleges that it rejected the first appraisal because it was out-of-date and it rejected the second appraisal because it was incomplete. Although plaintiffs argued that the two appraisals were sufficient with regard to the 1999 Loan Commitment, plaintiffs do not appear to argue that the two appraisals were acceptable as to the 2000 Loan Commitment. I note as well that Cambridge has submitted substantial evidence establishing that from April to June 2000, the parties were arranging for the preparation of a new appraisal or at least a partial appraisal; this activity further evidences the fact that defendants never approved the prior appraisals. *See* Letter dated April 5, 2000, from Cummings to Benchmark Appraisal Group; Letter dated April 12, 2000, from Cummings to Ellis; Facsimile dated April 18, 2000, from Benchmark Appraisal Group to Ellis.

$9 million loan: (1) personal resumes; (2) federal income tax returns for three years; (3) financial statements of the borrower and its affiliates; (4) environmental reports and appraisals; (5) 1999 and 2000 real estate tax assessments; and (5) other documents or data deemed relevant by Cambridge. 1999 Loan Commitment, Schedule B. Schedule B clearly specified all of the documents requested by Cambridge. It would not be tenable to interpret the ten-day provisions as categorically requiring Cambridge to request these documents in writing again within ten days of finalizing the 2000 Loan Commitment.

Plaintiffs have failed to establish any basis for applying the ten-day provisions to Schedule B. Nor have plaintiffs established any basis for applying the ten-day provisions to Cambridge's request for a current appraisal. Because the 2000 Loan Commitment clearly and unambiguously conditioned the funding of the loan on Cambridge's approval of a current appraisal and because the commitment did not place any express restrictions on Cambridge's prerogative to approve or reject an appraisal, I shall reject plaintiffs' interpretation and proposed application of the ten-day provisions. Therefore, I shall grant defendants' motion for summary judgment as to count II.

## C.

█ Plaintiffs have failed to offer any argument in support of count III, apparently conceding this claim. This is not surprising, as Maryland does not recognize a separate cause of action for the breach of implied duty of good faith and fair dealing. As I discussed in *Wootton Enter., Inc. v. Subaru of America, Inc.*, 134 F.Supp.2d 698 (D.Md.2001), there is an implied duty of good faith and fair dealing in all contracts under Maryland law. *See Parker v. Columbia Bank*, 91 Md.App. 346, 604 A.2d

521 (1992), *cert. denied*, 327 Md. 524, 610 A.2d 796 (1992). This duty "simply prohibits one party to a contract from acting in such a manner as to prevent the other party from performing his obligations under the contract," but does not require affirmative action not mandated by the contract. *Id.* (citing *Automatic Laundry Serv. v. Demas*, 216 Md. 544, 141 A.2d 497 (1958)). Furthermore, this implied duty cannot, override or modify specific contractual terms. *Riggs Nat. Bank of Washington, D.C. v. Linch*, 36 F.3d 370, 373 (4th Cir.1994). While this implied duty applies to performance of contractual obligations, Maryland courts "have not explicitly recognized a separate cause of action relating to this duty." *Lofton v. TLC Laser Eye Centers, Inc.*, 2001 WL 121809 *5 (D.Md. Feb.8, 2001), (citing *Food Fair Stores, Inc. v. Blumberg*, 234 Md. 521, 534, 200 A.2d 166 (1964)); *see also Abt Assoc., Inc. v. JHPIEGO Corp.*, 104 F.Supp.2d 523, 534 (D.Md.2000) (holding that Maryland does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing), *aff'd*, 9 Fed.Appx. 172 (4th Cir. May 17, 2001) (table); *Baker v. Sun Co.*, 985 F.Supp. 609, 610 (D.Md. 1997) (same). Accordingly, I shall dismiss count III for failure to state a claim.

## IV.

For the reasons set forth herein, defendants' motions shall be granted and plaintiffs' motion shall be denied.